JS 44   (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Douglas M. Carpenter, Daniel Kletcheck, Christopher M. Walker, on behalf of themselves and all others similarly situated

**DEFENDANTS**

Pepperidge Farm, Incorporated

**(b)** County of Residence of First Listed Plaintiff   Montgomery
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Fairfield
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Charles J. Kocher, Esq. & Matthew A. Luber, Esq.
McOmber McOmber & Luber, P.C.
39 E. Main Street, Marlton, NJ 08053, 856-985-9800

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
*(U.S. Government Not a Party)*

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical |  |  | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury |  | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product |  | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability |  | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
|  |  | **PERSONAL PROPERTY** |  | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☒ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise |  |  | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
|  |  |  | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence |  |  | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | **IMMIGRATION** |  | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | ☐ 462 Naturalization Application |  |  |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 465 Other Immigration Actions |  |  |
|  | ☐ 448 Education | ☐ 540 Mandamus & Other |  |  |  |
|  |  | ☐ 550 Civil Rights |  |  |  |
|  |  | ☐ 555 Prison Condition |  |  |  |
|  |  | ☐ 560 Civil Detainee - Conditions of Confinement |  |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original Proceeding

☐ 2  Removed from State Court

☐ 3  Remanded from Appellate Court

☐ 4  Reinstated or Reopened

☐ 5  Transferred from Another District *(specify)*

☐ 6  Multidistrict Litigation - Transfer

☐ 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
29 U.S.C. §§ 201, et. seq. ("FLSA")
Brief description of cause:
Plaintiffs are alleging FLSA violations.

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
08/10/2020

SIGNATURE OF ATTORNEY OF RECORD
*Charles J. Kocher*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ Hatboro, Pennsylvania _____

Address of Defendant: _____ 595 Westport Ave., Norwalk, Connecticut 06851 _____

Place of Accident, Incident or Transaction: _____

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?                    Yes ☐    No ☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☐    No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?    Yes ☐    No ☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?                    Yes ☐    No ☐

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 08/10/2020     _____     PA 93141
                          *Must sign here*
                     *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.    Federal Question Cases:**

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☑ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
     *(Please specify):* _____

**B.    Diversity Jurisdiction Cases:**

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
     *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Charles J. Kocher _____, counsel of record *or* pro se plaintiff, do hereby certify:

- ☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

- ☐ Relief other than monetary damages is sought.

DATE: 08/10/2020     _____     PA 93141
                          *Sign here if applicable*
                     *Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

Douglas M. Carpenter, Daniel Kletcheck,          :          CIVIL ACTION
Christopher M. Walker, et al.                              :
                           v.                                        :
                                                                         :
Pepperidge Farm, Incorporated                       :
                                                                         :          NO.

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants.  (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
     and Human Services denying plaintiff Social Security Benefits.          ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.          ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
     exposure to asbestos.          ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
     commonly referred to as complex and that need special or intense management by
     the court.  (See reverse side of this form for a detailed explanation of special
     management cases.)          (X)

(f) Standard Management – Cases that do not fall into any one of the other tracks.          ( )


August 10, 2020_____   Charles J. Kocher_____   Plaintiffs_____
**Date**                                        **Attorney-at-law**                            **Attorney for**

856-985-9800_____   856-263-2450_____   cjk@njlegal.com_____
___
**Telephone**                                **FAX Number**                                **E-Mail Address**


**(Civ. 660) 10/02**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

------------------------------------- X
                                      :
DOUGLAS M. CARPENTER, DANIEL          :
KLETCHECK, CHRISTOPHER M. WALKER,     :      **Civil Action No. _____**
                                      :
      Plaintiffs, on behalf of   :
      themselves and all others  :
      similarly situated,        :
                                      :      **JURY TRIAL DEMANDED**
  - vs. -                          :
                                      :
PEPPERIDGE FARM, INCORPORATED,        :
                                      :
      Defendant.                 :
------------------------------------- X

**COMPLAINT-CLASS/COLLECTIVE ACTION**

Plaintiffs Douglas Carpenter, Daniel Kletcheck, and Christopher M. Walker deliver food products to retail stores and other end users on behalf of Pepperidge Farm, Incorporated ("Defendant" or "Pepperidge Farm") pursuant to form contracts like those attached as Exhibits A-C (Plaintiffs' Consignment Agreements). In this "hybrid" class/collective action lawsuit arising from Defendant Pepperidge Farm's misclassification of its delivery drivers in the Commonwealth of Pennsylvania as "independent contractors," Plaintiffs allege that Defendant Pepperidge Farm has: (i) failed to pay them overtime premium compensation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et. seq.*; (ii) subjected them to improper pay deductions in violation of the Pennsylvania Wage Payment and Collection Law ("PWPCL"), 43 P.S. §§ 260.1, *et seq.*; and (iii) been unjustly enriched under Pennsylvania common law. Plaintiffs, on behalf of themselves and on behalf of all others similarly situated, seek all damages available under these claims.

1

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over the FLSA claim pursuant to 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

2.     This Court has subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

3.     Venue is proper pursuant to 28 U.S.C. § 1391.  Defendant Pepperidge Farm is located in and/or regularly conducts business in this judicial district.

## PARTIES

4.     Plaintiff Doug Carpenter ("Carpenter") resides in Hatboro, Pennsylvania.  He has been a Pepperidge Farm distributor since July 6, 2015.

5.     Plaintiff Daniel Kletcheck ("Kletcheck") resides in Langhorne, Pennsylvania.  He has been a Pepperidge Farm distributor since 2009.

6.     Plaintiff Christopher M. Walker ("Walker") resides in Warminster, Pennsylvania. He has been a Pepperidge Farm distributor since 2006.

7.     Defendant Pepperidge Farm is a Connecticut corporation with its principal place of business at 595 Westport Ave., Norwalk Connecticut 06851.  Defendant Pepperidge Farm misclassifies its employees, who deliver and stock baked food products from its Pennsylvania distribution centers, as independent contractors.  Defendant Pepperidge Farm is and was, at all relevant times, an employer under Pennsylvania law.

## FACTS

8.     Pepperidge Farm maintains a network of Distributors in Pennsylvania to distribute its biscuit and snack products throughout the Commonwealth of Pennsylvania.

9.     Pepperidge Farm sells its products to various retail stores such as grocery stores,

mass merchandisers, and convenience stores and relies on its Distributors to deliver its products to market. Distributors deliver, stock, merchandise, promote, and remove Pepperidge Farm products for stores in defined territories.

10. Plaintiffs and Class Members performed delivery, stocking, merchandising, promotional, and removal services on behalf of Pepperidge Farm in Pennsylvania.

11. Upon information and belief, Pepperidge Farm has employed hundreds of Distributors in Pennsylvania during the Class Period.

12. In order to perform work for Pepperidge Farm, Plaintiffs and similarly situated Distributors signed a Pepperidge Farm "Consignment Agreement" (hereinafter "Agreement"), which detailed the terms of Distributors' work for Defendant and labels Distributors as "independent businessm[e]n." Copies of Plaintiffs' Agreements are attached to this Complaint as Exhibits A-C and are, upon information and belief, substantially similar in substance to the Agreements signed by the putative Class/Collective Members that Plaintiffs seek to represent. While Distributors pay for the opportunity to enter into these Agreements and to secure an assigned distribution territory, Pepperidge Farm's right to control, and extensive actual control, over Plaintiffs and Class/Collective Members is such that the Distributors are actually employees under Pennsylvania law.

13. Pepperidge Farm retained the right to terminate Distributors' contracts at any time without cause. The Agreement states, "[Defendant] shall have the right in its discretion to terminate this Agreement at any time without cause upon written notice to the Consignee." Exh. A at ¶ 23.

14. In addition, Pepperidge Farm also retained the right to terminate Distributors' contracts at its discretion for cause. Exh. A at ¶ 19. Defendant's "for cause" grounds for

termination, as stated in Distributors' Agreements, reserved the right for Defendant to exercise extensive control over the details of Distributors' work.  Defendant retained the right to terminate Distributors' contracts for "failure of [Distributor] to realize the sales potential of the Territory and Consignee's failure to make satisfactory improvement within thirty days after notice of inadequacy . . . ." Exh. A at ¶ 19(a).  In order to use their best efforts to fully realize the sales potential of their routes, Distributors were required by the terms of the Agreement to:

a. "actively solicit all retail stores in the Territory whose accounts can by [*sic*] profitably handled;"

b.  "maintain at all times an adequate and fresh supply of Consigned Products in all such retail stores;"

c. "provide distribution service to all such retail stores on such days of the week (including weekends), at such intervals and with such frequency as is necessary to realize the full sales potential thereof and to maintain an adequate fresh supply of Consigned Products therein;"

d. "make available to all such retail stores all varieties of authorized Consigned Products unless it is demonstrably unprofitable to do so;"

e. "cooperate with [Defendant] in the effective utilization of [Defendant's] advertising, sales promotion, and space merchandising programs and;"

f. "keep fully informed of [Defendant's] recommended policies and method for increasing sales and improving distribution service." Exh. A at ¶ 4.

15. Distributors' contracts could also be terminated for cause for the following reasons, which gave Pepperidge Farm great latitude in determining how Distributors carried out their duties:

a. the "failure of [Distributor] adequately to realize the sales potential of the Territory and [Distributor's] failure to make satisfactory improvement within thirty days after notice of inadequacy from [Defendant]" Exh. A ¶19(a);

b. the "failure of [Distributor] to maintain the general appearance and condition of its truck(s) or other equipment, the general appearance or deportment or that of its officers, directors, employees, agents, representatives, or helpers, in accordance with standards in keeping with the established reputation of [Defendant] and the high quality of its products and the continuance of such failure for more than five days after written notice thereof from [Defendant]" Exh. A ¶19(c); or

c. "any actions, activities or practices of [Distributor or agents] which either do, or in the opinion of [Defendant] are likely to, materially damage the reputation of [Defendant] and/or [Defendant's] relations or reputation with consumers, retail stores, or any other purchaser of Consigned Products" Exh. A ¶19(f).

16.     Pepperidge Farm employed sales managers who supervised Distributors' work, including that of Plaintiffs.  Through its sales managers and other agents, Defendant conducted regular evaluations of Distributors' sales and store performance.  If a Distributor's performance was deemed inadequate, Defendant retained the right to send the Distributor a letter requiring that he or she remedy performance within five days, or Defendant could make other arrangements to service the store and could even terminate the Distributor's contract.  Exh. A at ¶ 7.

17.     Pepperidge Farm retained the right to "establish reasonable sales and/or distribution goals for [Distributor] and this Distributorship" and required that Distributors "***shall*** either meet or exceed such goals."  Exh. A at ¶ 4 (emphasis added).  Defendant's sales managers

often set such goals for Distributors throughout the year.  Under the terms of Defendant's Agreement, failure to meet or exceed Defendant's sales or distribution goals was "for cause" grounds for termination of a Distributor's contract.  *See* Exh. A at ¶¶ 19(a), (b), (d).

18.     Pepperidge Farm retained the right to exercise control over the manner and means of accomplishing the delivery of its products to market through its Distributors.  Defendant requires Plaintiffs and other members of the FLSA Collective and Pennsylvania Class to perform their duties under the policies, procedures, pricing and promotions set by Defendant Pepperidge Farm.  Defendant provided Distributors with schematics, or "plan-o-grams," which depicted precisely how its Distributors should display the products that they delivered to stores. Pepperidge Farm, not Distributors, determined the wholesale price of its product.  Pepperidge Farm directed the number of times that Distributors should visit their stores each week, and monitored Distributors' activity through its sales managers and its billing and ticketing systems. Pepperidge Farm retained the right to require that Distributors attend quarterly sales meetings where sales managers informed Distributors of Defendant's upcoming promotions and praised Distributors with the highest sales numbers.  Pepperidge Farm also negotiated the space for its products at the stores its Distributors serviced.  If stores did not wish to receive deliveries from Defendant's Distributors, Pepperidge Farm retained the right to make other arrangements with the store for the delivery of its products. *See* Exh. A at ¶ 8.

19.     Pepperidge Farm determined the days that its Distributors could pick up their product from the warehouse.

20.     Pepperidge Farm disciplines its Distributors and its policies and practices regarding such discipline, as set forth in its common Agreements, demonstrate control over its Distributors that an employer has over its employees.  *See* Exh. A at ¶ 7.

6

21.     Pepperidge Farm also required that its Distributors purchase and maintain a specialized handheld device, along with a printer, that transmitted detailed information about Distributors' deliveries, including when these deliveries occurred and to which stores. Pepperidge Farm charges its Distributors fees associated with weekly maintenance of its handheld device, among other charges for supplies.

22.     Defendant contacts Plaintiffs and the FLSA Collective/Pennsylvania Class regularly via the handheld device, emails, regular mail, text message, and/or via phone calls regarding communications such as, without limitation, stores needing Defendant's products, placement of product in stores, and/or promotions of Defendant.

23.     Distributors routinely worked a substantial number of overtime hours a week on Agreements that last indefinitely.

24.     Despite Defendant's extensive right of control over Distributors' work, Defendant has routinely classified Distributors as independent contractors.

25.     Even though Pepperidge Farm labeled "independent businessm[e]n," Distributors were not permitted to sell their Distributorships without "prior written approval of [Defendant]". Exh. A at ¶¶ 15, 18.  Defendant required that any buyer of Plaintiffs' Distributorships meet Defendant's requirements as to "character, ability, financial responsibility, business acumen, and adequate facilities . . . ."  *Id.* at ¶ 18.  Defendant retained the right to interview prospective buyers and require that Plaintiffs' prospective buyers submit a business plan to Defendant, which Defendant would have to approve in order for a sale to take place.  Defendant retained "its Right of First Refusal" for any sale of all or any portion of the Distributorship.  *Id.*

26.     Upon information and belief, Defendant misclassified Plaintiffs and similarly situated Distributors knowingly and willfully.

27.     Pepperidge Farm has paid Plaintiffs and Class/Pennsylvania Collective Members under a common compensation plan and policy where Distributors were paid a sales commission based on the items sold.

28.     Defendant has caused Plaintiffs and similarly situated Class/Pennsylvania Collective Members to work hours in excess of 40 hours a week.

29.     As a result of Defendant's misclassification of Distributors as "independent businessmen," Defendant has failed to pay overtime compensation to Plaintiffs and similarly situated Class Members for hours worked in excess of eight hours per day and/or 40 hours per week.

30.     As a result of Defendant's misclassification of Distributors as "independent contractors," Defendant has failed to indemnify Plaintiffs and similarly situated Class Members for employment-related expenses, including the cost of providing appropriate vehicles and vehicle expenses such as fuel, maintenance, repair; the cost and maintenance of a handheld device and printer; the cost of warehousing Defendant's products; pallet fees that Defendant charged Plaintiffs and similarly situated Class Members; expenses incurred as the result of stale products and inventory irregularities; and the cost of required business liability insurance.

31.     As a result of Defendant's misclassification of Distributors as "independent contractors," Defendant has unlawfully collected and withheld earned wages through deducting, without limitation:  pallet fees/assessments, the cost and maintenance of a handheld computer device(s) and printer(s), and charges incurred as the result of stale products and inventory irregularities.

32.     The policies related to any deductions from the wages of Plaintiffs and the FLSA Collective/Pennsylvania Class regarding stale products were set by Defendant only without any

negotiation or participation by Defendant's Distributors.

33.     As a result of Defendant's misclassification of Distributors as "independent contractors," Defendant has failed to itemize the total hours worked on wage statements furnished to Plaintiffs and similarly situated Class Members; to maintain payroll records showing the actual hours worked by Plaintiffs and the Class members; and/or to record the actual hours worked by Plaintiffs and similarly situated Class Members.

34.     As a result of Defendant's misclassification of Distributors as "independent contractors," Defendant has willfully and knowingly failed to pay Plaintiffs and similarly situated Class Members upon termination of employment, all accrued compensation, including repayment of all unlawful charges, compensation for missed meal and rest periods, and payment of overtime compensation.

## CLASS ACTION ALLEGATIONS

35.     Pursuant to Federal Rule of Civil Procedure 23(b)(3), Plaintiffs bring this action on their own behalf and as a class action on behalf of all persons or entities who have been employed by Defendant Pepperidge Farm as Distributors under its Agreements in the Commonwealth of Pennsylvania at any time within four years preceding the filing of this action.

36.     Plaintiffs bring their FLSA claim on behalf of themselves and all other persons who, either individually or through individually-owned corporate entities (e.g., individually-owned LLCs), have performed food distribution work for Defendant Pepperidge Farm in Pennsylvania within the past three years pursuant to Agreements or similar contracts ("FLSA Collective").

37.     Plaintiffs bring their PWPCL claim on behalf of themselves and all other persons who, either individually or through individually-owned corporate entities (e.g., individually-

owned LLCs), have performed food distribution work for Defendant in the Commonwealth of Pennsylvania ("Pennsylvania Class") within the past three years pursuant to Agreements or similar contracts.

38.    Plaintiffs bring their unjust enrichment claim on behalf of themselves and the Pennsylvania Class within the past four years.

39.    Plaintiffs' FLSA claim should proceed as a collective action because Plaintiffs and other putative collective members, having worked pursuant to the common overtime pay policy described herein, are "similarly situated" as that term is defined in 29 U.S.C. § 216(b) and the associated decisional law.

40.    Class action treatment of Plaintiffs' state law claims is appropriate because, as alleged below, each of Federal Rule of Civil Procedure 23's class action requirements is satisfied.

41.    The class, upon information and belief, includes over 100 individuals, all of whom are readily ascertainable based on Defendant's payroll records and are so numerous that joinder of all class members is impracticable.

42.    Plaintiffs are class members, their claims are typical of the claims of other class members, and they have no interests that are antagonistic to or in conflict with the interests of other class members.  Plaintiffs are informed and believe that, like other Distributors, Plaintiffs were misclassified as "independent contractors" when they were actually statutory and common-law employees and were therefore deprived the protections of employee status under the law. Plaintiffs had the same duties and responsibilities as other class members, and were subject to the same policies and practices, and the same or substantially similar conditions of employment.

43.    Plaintiffs and their lawyers will fairly and adequately represent the class members

10

and their interests.  Plaintiffs have been treated in the same manner as other class members by Defendant and have been damaged by this treatment in the same manner as other class members by their loss of overtime premium wages, their exclusion from employee compensation programs, plans and agreements, and their payment of Defendant's expenses.  Plaintiffs are committed to prosecuting this action.  Plaintiffs have retained attorneys with significant class action experience.

44.     Questions of law and fact are common to all class members, because, *inter alia*, this action concerns Defendant's common business policies, as described herein.  The legality of these practices will be determined through the application of generally applicable legal principles to common facts.

45.     Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact predominate over questions affecting only individual class members and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Those common questions that predominate over any questions that may affect individual Class members include:  (i) whether Plaintiffs and Class members have been misclassified as independent contractors and actually were or are employees of Defendant; and (ii) whether Defendant has violated the rights of Plaintiffs and Class members by making illegal deductions from their wages, depriving them of overtime and other benefits of being employees, and requiring them to pay Defendant's expenses.

## COUNT I - FLSA

### [On Behalf of Plaintiffs an FLSA Collective of Pennsylvania Distributors]

46.     All previous paragraphs are incorporated as though fully set forth herein.

47.     The FLSA requires that employees receive overtime premium compensation

11

calculated at 150% of their regular pay rate for all hours worked over 40 per week. *See* 29 U.S.C. § 207(a)(1).

48.     Defendant Pepperidge Farm is an employer that is required to comply with the FLSA's overtime pay mandate, and Plaintiffs and the FLSA Collective members are employees entitled to the mandate's protections.

49.     Defendant Pepperidge Farm violated the FLSA by failing to pay Plaintiffs and FLSA Collective members' overtime premium compensation for hours worked over 40 per week.

50.     In violating the FLSA, Defendant Pepperidge Farm acted willfully and with reckless disregard of clearly applicable FLSA provisions.

## COUNT II – PWPCL

**[On Behalf of Plaintiffs and the Rule 23(b)(3) Pennsylvania Class]**

51.     All previous paragraphs are incorporated as though fully set forth herein.

52.     The PWPCL prohibits pay deductions except for those explicitly permitted by law or regulation. *See* 43 P.S. § 260.3; 34 Pa. Code § 9.1; *see generally Ressler v. Jones Motor Co., Inc.,* 487 A.2d 424 (Pa. Super. 1985).

53.     Defendant Pepperidge Farm is an employer that is required to comply with the PWPCL, and Plaintiffs and other Pennsylvania Class members are employees entitled to the PWPCL's protections.

54.     The various deductions that Defendant took from Plaintiffs and other class members, as alleged herein, are not permitted by the PWPCL and, therefore, violate the PWPCL.

## COUNT III – Unjust Enrichment

**[On Behalf of Plaintiffs and the Rule 23(b)(3) Pennsylvania Class]**

55.     All previous paragraphs are incorporated as though fully set forth herein.

56.     The Pennsylvania doctrine of unjust enrichment permits a plaintiff to recover from a defendant where (i) the plaintiff has conferred benefits on the defendant; (ii) such benefits have been appreciated by the defendant; and (iii) it would be inequitable for the defendant to retain such benefits without payment of value.  Under such circumstances, a plaintiff must be compensated for the benefits unjustly received by the defendant.

57.     Under the unjust enrichment doctrine, Plaintiffs and all Pennsylvania Class members seek the recovery of monies retained by Defendant due to Pepperidge Farm's extra-contractual business practice of requiring Distributors to incur the types of operating expenses ordinarily incurred by employers.  These operating expenses include, without limitation, gasoline expenses, vehicle expenses, vehicle insurance, liability insurance, and/or maintenance fees for the handheld device(s)/printers(s), including cellular data fees for the handheld device(s) and printer(s).  Defendant has avoided such expenses by misclassifying Plaintiffs and the Pennsylvania Class/FLSA Collective members as non-employee contractors even though Defendant both retains and exercises the right to control the most significant aspects of the Distributor position.  Under such circumstances, it is inequitable for Defendant to retain the benefits of the misclassification.

58.     Moreover, if the Court determines that any Plaintiff or group of class members is not in privity of contract with Defendant or that the pay deductions associated with the PWPCL claim are not governed by the contract, then such Plaintiff or group of class members will invoke the unjust enrichment doctrine to recover the value of the pay deductions that are the subject of

the PWPCL claim.  Under the circumstances alleged herein, it would inequitable for Defendant to retain the benefits associated with such claims.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and other members of the FLSA Collective and Pennsylvania Class, seek the following relief:

a.  Pursuant to 29 U.S.C. § 216(b), conditionally certify this case as an FLSA "collective action" and approve the dissemination of notice to similarly-situated persons and informing them of this action and enabling them to opt-in;

b.  Certify the Pennsylvania Class pursuant to Federal Rule of Civil Procedure 23(b)(3);

c.  Enter judgment in favor Plaintiffs and the Pennsylvania Class/FLSA Collective and against Defendant Pepperidge Farm;

d.  Award the payment of all overtime wages; the reimbursement of all improper pay deductions, fees, charges, and other out-of-pocket expenditures; liquidated damages under the FLSA and PWPCL; pre- and post-judgment interest; all available declaratory or injunctive relief; and such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial.

Respectfully,

Dated: August 10, 2020          By:     */s/ Charles J. Kocher*
                                        Matthew A. Luber, Esq.
                                        PA ID # 309323
                                        Charles J. Kocher, Esq.
                                        PA ID # 93141
                                        McOMBER, McOMBER & LUBER, P.C.
                                        39 E. Main Street
                                        Marlton, NJ 08053
                                        Telephone: (856) 985-9800
                                        Facsimile: (856) 263-2450
                                        E-mail: mal@njlegal.com
                                        E-mail: cjk@njlegal.com


                                        Simon B. Paris, Esq.
                                        Patrick Howard, Esq.
                                        SALTZ, MONGELUZZI, & BENDESKY, P.C.
                                        1650 Market Street, 52nd Floor
                                        Philadelphia, PA 19103
                                        Telephone:  (215) 496-8282
                                        Facsimile:  (215) 496-0999
                                        E-mail:  sparis@smbb.com
                                        E-mail:  phoward@smbb.com

                                        ***Attorneys for Plaintiffs and the Putative
                                        Pennsylvania Class/FLSA Collective Members***

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

------------------------------------- X
                      :

DOUGLAS   M.   CARPENTER,   DANIEL :
KLETCHECK, CHRISTOPHER M. WALKER,         **Civil Action No. _____**
                      :

        Plaintiffs, on behalf of   :
        themselves and all others  :
        similarly situated,     :
                      :
                      :
  - vs. -                   :
                      :

PEPPERIDGE FARM, INCORPORATED,   :
                      :
        Defendant.           :
------------------------------------- X

### NOTICE OF CONSENT TO BECOME PARTY PLAINTIFF

I consent pursuant to Section 16(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b), to

become a party plaintiff in the above-captioned action. I agree to be represented by Saltz Mongeluzzi &

Bendesky, P.C. and its undersigned co-counsel. I understand that I will be bound by the judgment of the

Court on all issues in this case, including the fairness of any settlement.

| Signature: *Douglas Carpenter* | Phone Number: REDACTED |
|---|---|
| Date: 8 \| 5 \| 2020 | Address: REDACTED Hatboro, Pa 19040 |
| Name (Print): Douglas Carpenter | Email Address: REDACTED |

PLEASE RETURN TO:

| Matthew A. Luber, Esq. | Simon B. Paris, Esq. |
|---|---|
| Charles J. Kocher, Esq. | Patrick Howard, Esq. |
| McOMBER, McOMBER & LUBER, P.C. | SALTZ, MONGELUZZI, & BENDESKY, P.C. |
| 30 S. Maple Avenue | 1650 Market Street, 52nd Floor |
| Marlton, NJ 08053 | Philadelphia, PA 19103 |
| (856) 985-9800 Phone | Telephone: (215) 496-8282 |
| (732) 530-8545 Fax | Facsimile: (215) 496-0999 |
| mal@njlegal.com | E-mail: sparis@smbb.com |
| cjk@njlegal.com | E-mail: phoward@smbb.com |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

DOUGLAS M. CARPENTER, DANIEL
KLETCHECK, CHRISTOPHER M. WALKER,

               Plaintiffs, on behalf of
               themselves and all others
               similarly situated,

  - vs. -

PEPPERIDGE FARM, INCORPORATED,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

**Civil Action No. _____**

## NOTICE OF CONSENT TO BECOME PARTY PLAINTIFF

I consent pursuant to Section 16(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b), to

become a party plaintiff in the above-captioned action. I agree to be represented by Saltz Mongeluzzi &

Bendesky, P.C. and its undersigned co-counsel. I understand that I will be bound by the judgment of the

Court on all issues in this case, including the fairness of any settlement.

| Signature: | Phone Number: |
| --- | --- |
| | REDACTED |
| Date:<br>8 - 6 - 2020 | Address:<br>REDACTED Langhorne PA 19047 |
| Name (Print):<br>Daniel Kletcheck | Email Address:<br>REDACTED |

PLEASE RETURN TO:

| | |
| --- | --- |
| Matthew A. Luber, Esq.<br>Charles J. Kocher, Esq.<br>McOMBER, McOMBER & LUBER, P.C.<br>30 S. Maple Avenue<br>Marlton, NJ 08053<br>(856) 985-9800 Phone<br>(732) 530-8545 Fax<br>mal@njlegal.com<br>cjk@njlegal.com | Simon B. Paris, Esq.<br>Patrick Howard, Esq.<br>SALTZ, MONGELUZZI, & BENDESKY, P.C.<br>1650 Market Street, 52nd Floor<br>Philadelphia, PA 19103<br>Telephone: (215) 496-8282<br>Facsimile: (215) 496-0999<br>E-mail: sparis@smbb.com<br>E-mail: phoward@smbb.com |

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                                                :
DOUGLAS    M.    CARPENTER,    DANIEL                            :
KLETCHECK, CHRISTOPHER M. WALKER,                               :     Civil Action No. _____
                                                                :
              Plaintiffs, on behalf of                          :
              themselves and all others                         :
              similarly situated,                               :
                                                                :
                                                                :
       - vs. -                                                  :
                                                                :
PEPPERIDGE FARM, INCORPORATED,                                 :
                                                                :
              Defendant.                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
```

### NOTICE OF CONSENT TO BECOME PARTY PLAINTIFF

I consent pursuant to Section 16(b) of the Fair Labor Standards Act, 29 U.S.C. § 216(b), to

become a party plaintiff in the above-captioned action. I agree to be represented by Saltz Mongeluzzi &

Bendesky, P.C. and its undersigned co-counsel. I understand that I will be bound by the judgment of the

Court on all issues in this case, including the fairness of any settlement.

| Signature: | Phone Number: |
|---|---|
| *[signature]* | ███████████ |
| Date:  8/5/2020 | Address:  ███████████ Warminster, PA 18974 |
| Name (Print):  Christopher M. Walker | Email Address:  ███████████ |

PLEASE RETURN TO:

| | |
|---|---|
| Matthew A. Luber, Esq.<br>Charles J. Kocher, Esq.<br>McOMBER, McOMBER & LUBER, P.C.<br>30 S. Maple Avenue<br>Marlton, NJ 08053<br>(856) 985-9800 Phone<br>(732) 530-8545 Fax<br>mal@njlegal.com<br>cjk@njlegal.com | Simon B. Paris, Esq.<br>Patrick Howard, Esq.<br>SALTZ, MONGELUZZI, & BENDESKY, P.C.<br>1650 Market Street, 52nd Floor<br>Philadelphia, PA  19103<br>Telephone:  (215) 496-8282<br>Facsimile:  (215) 496-0999<br>E-mail:  sparis@smbb.com<br>E-mail:  phoward@smbb.com |

# EXHIBIT A

2001 – CORPORATION

# PEPPERIDGE FARM

# CONSIGNMENT AGREEMENT

\* \* \*

**PEPPERIDGE FARM, INCORPORATED**
**595 WESTPORT AVENUE**
**NORWALK, CONNECTICUT  06851-4482**

**HEREBY GRANTS**

**AN**

**EXCLUSIVE DISTRIBUTORSHIP**

**TO**

**CORPORATION NAME:**          **CARPENTER CORE INC.**

**CORPORATION ADDRESS:**        REDACTED

**HATBORO, PA 19040**

**AS A**
**CONSIGNEE**
**WITHIN THE TERRITORY AND UPON THE**
**TERMS STATED IN THE FOLLOWING PAGES**

**WITH GUARANTY BY**

**GUARANTOR NAME:**          **DOUGLAS M. CARPENTER**

**GUARANTOR ADDRESS:**        REDACTED

**HATBORO, PA 19040**

**AS GUARANTOR**

## DEFINITIONS

(a)   BAKERY ⸺ refers to PEPPERIDGE FARM, INCORPORATED, the grantor of the Distributorship, a Connecticut corporation having its principal office in Norwalk, Connecticut.

(b)   CONSIGNEE ⸺ refers to the grantee of this Distributorship identified on the cover page of this Agreement.

(c)   TERRITORY ⸺ refers to the territory described in Schedule A hereto.

(d)   CONSIGNED PRODUCTS ⸺ refers to those products listed in Schedule B hereto (subject to modification per Paragraph 10) but only when packaged or wrapped in retail packaging under the brand name "Pepperidge Farm" and sold or intended to be sold to retail stores as fresh (*i.e.,* not preserved or stale), first quality (*i.e.,* not Seconds) merchandise and does not include (1) any of such products sold, or intended to be sold, to retail stores, frozen, refrigerated, canned, or otherwise preserved, (2) any of such products sold, or intended to be sold, to retail stores in a raw or uncooked state, (3) any of such products sold, or intended to be sold, to retail stores in bulk for resale by such retail stores at an in-store bakery or at a food-service counter or food-service section located within such retail store, (4) Stale Products, (5) Seconds, (6) merchandise of others containing Consigned Products as components, (7) any of such products packaged or wrapped in food-service or other non-retail packaging, or (8) any of such products packaged, wrapped or sold under any brand name other than "Pepperidge Farm."

(e)   STALE PRODUCTS ⸺ refers to Consigned Products whose shelf life has expired, as determined by Bakery's stale policy existing from time to time.

(f)   SECONDS ⸺ refers to Consigned Products which do not meet the high standards required by Bakery for distribution in the ordinary manner and thus are deemed by Bakery, in its sole discretion, to be unsuitable for that purpose.

(g)   DISTRIBUTION OR DISTRIBUTE ⸺ refers to the sale and delivery of Consigned Products to retail stores within the Territory and to such hotels, restaurants, etc., as may be authorized by Bakery per Paragraph 9.

(h)   BULLETIN PRICES ⸺ refers to the prices for Consigned Products charged by Bakery and published from time to time.

(i)   CHAIN ⸺ refers to any person, firm, corporation, or other legal entity that owns or operates three or more retail stores.

(j)   DISTRIBUTION – refers to the distribution rights described in, and established under, this Agreement.

(k)   GUARANTOR ⸺ refers to the guarantor of Consignee's duties and obligations under this Agreement identified on the cover page hereof.

## TERMS

1.   EXCLUSIVE OF DISTRIBUTORSHIP.  Consignee will have the exclusive right to distribute Consigned Products to retail stores within the Territory, and Bakery will not sell or deliver or authorize any others to sell or deliver Consigned Products to retail stores (except for the in-store bakeries, food-service counters and food-service sections located in retail stores) within the Territory, except in connection with temporary sales programs, and except for sales to direct customers pursuant to orders solicited by Consignee under Paragraph 3(b); provided, however, that Bakery will have the exclusive right to distribute Consigned Products to retail facilities owned or operated by Bakery, or by any corporation controlled by Bakery. The terms of this Paragraph are subject, however, to the terms of Paragraphs 6, 7, and 9.

2.   QUANTITIES CONSIGNED.  Bakery will consign and deliver to Consignee at such locations as shall, from time to time, be designated by Bakery, and Consignee will accept sufficient quantities of Consigned Products to maintain at all times an adequate and fresh supply thereof in all retail stores in the Territory which request such products and whose accounts are not demonstrably unprofitable; provided, however, Bakery reserves the right to allocate its products as nearly proportionately as practicable if the overall demand for its products exceeds its production. Consignee shall hold and care for all Consigned Products as the sole and exclusive property of Bakery. Title to all Consigned Products shall be vested in, subject to, and under the control of Bakery until delivered by Consignee to a purchaser. Consignee shall not encumber or grant any security interest in or lien on, or by action or inaction cause or allow any encumbrance, security interest, or lien to be imposed upon the Consigned Products.

3.   PROCEEDS AND RECORDS OF SALE.

(a)   Except as provided in subparagraph (b), Consigned Products shall be consigned to Consignee at Bulletin Prices, less the percentage specified in Schedule B, for sale and delivery to retail stores at such prices as Consignee may determine.

(b)   Bakery may bill directly any Chains and military commissaries that have requested such direct billing or that request it in the future. Such directly billed stores in the Territory will be direct customers of Bakery, and Consignee will solicit sales from them and receive product for delivery to them on Bakery's behalf at Bulletin Prices. Bakery assumes all credit risks with respect to Chains and military commissaries which receive such direct billing. The funds owed by such Chains and military commissaries as a result of the Consigned Products delivered are accounts receivable of, and debts payable to, Bakery and are not the property of Consignee. Consignee shall have the exclusive right to perform the service of delivery of Consigned Products to such customers of Bakery and Bakery shall not effect such delivery except through Consignee, subject to the provisions of Paragraphs 1, 6, 7, and 9.  For the performance of its services of solicitation and delivery under this subparagraph (b), Consignee, if it shall have made prompt and timely delivery of all charge tickets as required by subparagraph (d)(2), shall be paid a percentage of net proceeds payable to Bakery by the direct billing customers, such percentage to be calculated at the rate specified in Schedule B.

(c)   Bakery may, from time to time, extend credit to Consignee for Consigned Products to be sold to retail stores on credit extended by Consignee; provided Bakery has approved in advance the stores to receive such credit and the amount and terms thereof.  Notwithstanding the foregoing, any credit extended by Consignee shall be at Consignee's risk.

2

(d)   (1)   Consignee shall pay promptly each week on the day specified by Bakery for all Consigned Products sold and delivered by Consignee during the preceding week, less any amounts which would be otherwise due on such sales as to which Bakery shall have extended credit to Consignee under (c) above, plus any amounts becoming due during such week under the terms of credit extended during any previous week.

(2)   Consignee shall promptly deliver to Bakery on such days, as Bakery may specify, all charge tickets for all deliveries of Consigned Products to direct customers of Bakery for direct billing by Bakery.

(e)   Consignee will keep such records of Consigned Products received and sales and deliveries made as Bakery may, from time to time, reasonably request; Bakery may inspect such records and Consigned Products at such times as Bakery may select. Without limiting the generality of the foregoing, Consignee agrees that Bakery may take physical inventory of Consigned Products in Consignee's possession whenever and as often as Bakery deems advisable and that Consignee will keep such records of its operation and will furnish Bakery such copies thereof as Bakery may reasonably require.

4.   DISTRIBUTION EFFORTS.  Consignee will use its best efforts to realize the full sales potential of the Territory for Consigned Products. To this end, Consignee will (a) actively solicit all retail stores in the Territory whose accounts can be profitably handled, (b) maintain, at all times, an adequate and fresh supply of Consigned Products in all such retail stores, (c) provide distribution service to all such retail stores on such days of the week (including weekends), at such intervals and with such frequency as is necessary to realize the full sales potential thereof and to maintain an adequate and fresh supply of Consigned Products therein, (d) make available to all such retail stores all varieties of authorized Consigned Products unless it is demonstrably unprofitable to do so, (e) cooperate with Bakery in the effective utilization of Bakery's advertising, sales promotion and space merchandising programs and (f) keep fully informed of Bakery's recommended policies and methods for increasing sales and improving distribution service. Consignee may sell or distribute other products, not competitive with Consigned Products, so long as such sale or distribution does not otherwise violate any terms or conditions of this Agreement or interfere with Consignee's performance of its obligations under the terms of this Agreement. Bakery may, from time to time, establish reasonable sales and/or distribution goals for Consignee and this Distributorship. Consignee shall either meet or exceed such goals.

5.   DISTRIBUTION SERVICE AND FACILITIES.  Consignee will maintain efficient distribution service throughout the Territory in keeping with the established reputation of Bakery and the high quality of its products. To this end, Consignee will (a) provide adequate equipment and, if not otherwise provided by Bakery, facilities for the receipt, handling, and delivery of Consigned Products and the accounting, inventory, and billing thereof, including, without limitation, such computer and/or other systems as may be necessary or appropriate therefore, (b) comply with all laws and regulations relating either directly or indirectly to the operation or ownership of the Distributorship, including, without limitation, motor vehicle, food, drug, health and sanitary laws, and regulations, and (c) maintain such route books and other records as are required by Bakery from time to time. Pursuant to the foregoing, Consignee shall provide, and shall maintain in good and proper working condition and appearance, a delivery truck(s), computer, and such other equipment as, from time to time, shall be necessary for the operation of the Distributorship. Consignee shall maintain the general appearance and condition of such truck(s), computer, and other equipment, as well as the appearance and deportment of all Consignee's officers, directors, employees, agents, representatives, and helpers in accordance with the established reputation of Bakery and the high quality of its products.

6.   EMERGENCY SERVICE.  If, by reason of illness or vacation or any other cause, Consignee shall be unable at any time to provide or maintain the efficient distribution service contemplated by this Agreement, Consignee will make other suitable arrangements, at its own expense, for the provision and/or maintenance of such service; but if Consignee is unable or fails to do so, Bakery is authorized, in its discretion, to provide and/or maintain such service as Consignee's agent and at Consignee's expense and risk. Upon the request of Consignee, Bakery will endeavor in any emergency to provide and/or maintain such service as Consignee's agent and at Consignee's expense and risk.

7.   FAILURE TO SERVICE PARTICULAR STORES.  If Consignee fails, for any reason, to provide or maintain satisfactory distribution service to any segment of the Territory, or to any retail store within the Territory and such failure is not remedied within five days after written notice thereof from Bakery, Bakery, in addition to the other remedies available to it hereunder, may make other arrangements, on either a permanent or temporary basis, in the discretion of Bakery, for the service of such store or segment of the Territory as the case may be. If such arrangements for service are made on a permanent basis, the retail store or segment of the Territory involved shall be deemed to be no longer included in the Territory and Schedule A shall be modified accordingly, all without compensation or remuneration to Consignee.

8.   CHAIN STORE ACCOUNTS.  If any Chain requires that authorization for the distribution of Consigned Products to the Chain's retail stores in the Territory shall be obtained through a central or district office located outside of the Territory, or only in conjunction with the distribution of Consigned Products to its retail stores in other territories, Bakery will cooperate with Consignee in procuring such authorization. If any Chain refuses to pay or to permit store managers to pay any Consignee directly for Consigned Products and instead requires the submission of a consolidated bill to a central or district office of the Chain, Bakery will handle the billing, and the terms of Paragraph 3(b) shall apply.

9.   PROHIBITED SALES AND DELIVERIES.  Consignee will not sell or deliver any Consigned Products, or any products listed in Schedule B, directly to consumers or to any other purchasers except retail stores (exclusive of the in-store bakeries, food-service counters and food-service sections located in such retail stores) within the Territory and such hotels, restaurants, clubs, and similar organizations within the Territory as Bakery may authorize in writing. Also, Consignee will not, without like authorization, make deliveries of Consigned Products to any Chain via a central or district warehouse or in any manner other than directly to its retail stores. If, despite the good faith efforts of Consignee and Bakery to obtain permission from any Chain to make deliveries directly to its

3

retail stores, such Chain refuses to handle Consigned Products except via warehouse deliveries, Bakery shall have the right in its discretion to sell and deliver the Consigned Products directly to such chain for its own account via warehouse deliveries as long as such refusal remains in effect. In addition, Consignee shall, if requested to do so in writing by Bakery, on a non-exclusive basis and for the period of time set forth in such written request, distribute products listed in Schedule B (as modified from time to time pursuant to Paragraph 10) to in-store bakeries and to food-service counters and food-service sections located in retail stores in the Territory.

10.   MODIFICATION OF LIST PRODUCTS.  The list of Consigned Products set forth in Schedule B hereto may be modified or changed by Bakery from time to time by (a) adding such other products as it may deem advisable among those which it now or hereafter produces, (b) withdrawing within any sales district or other geographic area any Consigned Products (whether originally listed or subsequently added) which it discontinues producing or which it discontinues selling in such sales district or other geographic area, or (c) adding or withdrawing at any time with or without notice and for any reason any product designated as "test product," "for market test," or the like. In addition, Bakery shall have the right, from time to time, to change the ingredients, the method of production or the labeling or packaging of any Consigned Products. In addition, if Consignee fails to comply with the terms and conditions of this Agreement with respect to any Consigned Product or Consigned Products, then Bakery may, in addition to any other remedies available to it hereunder if such failure shall continue for a period of thirty days after written notice thereof from Bakery, without compensation or remuneration to Consignee, delete such Consigned Product or Consigned Products from Schedule B, in which event Consignee's right to distribute such deleted Consigned Products under the terms of this Agreement shall immediately terminate.

11.   SALES DATA.  Consignee will furnish to Bakery such sales data as it may reasonably require for the planning of its production schedules, the expansion of its operations, and the planning and conduct of sales promotion programs.

12.   TRADE NAME, ETC.  Consignee may use Bakery's trade name, trademark and distinguishing colors on its truck(s) and other equipment and supplies; provided, however, that (a) Bakery's trade name may not be used as a part of any business name or trade name of Consignee without the written consent of Bakery or in any other way which will tend to confuse the separate identities of Bakery and Consignee, and (b) Bakery shall have the right at any time to revoke the permission granted in this Paragraph if, in its opinion, the general appearance of Consignee's truck(s), or other equipment, or the general appearance or deportment of all Consignee's officers, directors, employees, agents, representatives, and helpers, shall fall below standards in keeping with the established reputation of Bakery and the high quality of its products.

13.   INSURANCE AND INDEMNIFICATION.  Consignee shall, at Consignee's expense, maintain adequate public liability, property damage and, where appropriate, workers' compensation insurance to protect Bakery and Consignee against any and all claims of personal injury, death, or property damage, other than damage to Consigned Products in possession of Consignee. Such insurance shall be in such amounts and have such limits as shall be acceptable to Bakery or required by the retail stores in the Territory, whichever is greater, shall name Bakery as an additional insured thereunder and shall provide that the insurance shall not be terminated without at least fifteen (15) days' prior written notice to Bakery. Consignee shall, prior to the date of execution of this Agreement, and at least annually thereafter, provide Bakery with insurance certificates evidencing such coverage. If Consignee fails to obtain or to maintain the insurance coverage required by this Paragraph, Bakery may, at its option, purchase such insurance coverage on behalf of Consignee, and Consignee shall reimburse Bakery in full for the cost thereof. Consignee covenants and agrees to indemnify, defend and save Bakery harmless from and against any and all claims relating to payroll, unemployment compensation, employee benefits, personal injury, death, or property damage (other than damage to Consigned Products in the possession of Consignee) caused or alleged to have been caused directly or indirectly by or as a result of the actions of Consignee or any of its officers, directors, employees, agents, representatives, or helpers or by or as a result of the operation of the Distributorship or any vehicle or equipment owned or used by Consignee or any of its officers, directors, employees, agents, representatives, or helpers and any and all losses, damages, liabilities, and expenses (including attorney's fees) incurred by Bakery as a result thereof. Anything in this Agreement to the contrary notwithstanding, this indemnification provision shall survive any termination of this Agreement.

14.   NON-PERFORMANCE FOR REASONS BEYOND CONTROL.  Neither Bakery nor Consignee shall be liable for any failure to comply with the terms of this Agreement if such failure shall have been caused primarily by fire, labor dispute, strike, war, insurrection, governmental restriction, or any other cause beyond the control of the party so failing.

15.   INDEPENDENT CONTRACTOR.  Consignee is a self-employed independent contractor, not an agent or employee of Bakery, and has no authority other than to distribute products consigned hereunder and to solicit orders for and make deliveries of Consigned Products in the case of direct sales of Bakery under Paragraph 3(b), express or implied, to do or perform any act or thing or to make any warranty or representation or promise or commitment of any character which will be binding upon Bakery, or for which it will be responsible, and Consignee will refrain from any conduct inconsistent with the terms of this Paragraph 15. Consignee may, at its own expense and risk, employ such persons as Consignee shall deem appropriate to assist in the performance of Consignee's obligations under the terms of this Agreement, and Consignee shall be responsible for the hiring, firing, training, and supervision of, and all remuneration and benefits for, any person so employed. The independent contractor relationship between Bakery and Consignee is an essential element of this Agreement. The discount percentage and commission rate described in Paragraph 3 and the percentages established pursuant to Schedule B or any similar schedule under this Agreement are based in substantial part on such independent contractor relationship and the understanding that the Bakery is not obligated to pay any FICA, income, or similar tax or withholding for or on behalf of the Consignee.

16.   LIEN OF BAKERY ON DISTRIBUTORSHIP.  Bakery shall have a first lien on the Distributorship and all proceeds of the Distributorship as security for all indebtedness of Consignee to Bakery at any time outstanding. Any sale, transfer or assignment of the Distributorship (invalid per Paragraph 18 without the written approval of Bakery) shall be subject to such lien unless such lien shall be expressly released by Bakery in writing. Consignee shall not, without the prior written consent of Bakery, encumber or grant any

4

security interest in or lien upon, or by its action or inaction cause or allow any encumbrance, security interest or lien to be imposed upon this Distributorship, other than the lien imposed by this Paragraph 16; and it is expressly agreed that Bakery shall have no obligation whatsoever to consent to any such encumbrance, security interest, or lien unless and until the proposed lienholder shall have agreed in writing to subordinate its lien, encumbrance, or security interest to the lien created by this Paragraph 16. Bakery's consent to any such encumbrance, security interest, or lien which has been so subordinated to the lien of Bakery established pursuant to this Paragraph 16 shall not be unreasonably withheld.

17.    RIGHT OF FIRST REFUSAL.  Consignee must give Bakery written notice of each proposed sale, conveyance or transfer (hereinafter "proposed sale") of all or any portion of this Distributorship, which notice shall identify the prospective purchaser and the terms and conditions of the proposed sale.  Such notice of proposed sale from Consignee shall be deemed to be an irrevocable offer to sell the Distributorship, or the portion thereof described in such notice of proposed sale, to Bakery on the terms and conditions set forth therein.  Bakery shall have the right, but not the obligation, to accept such offer by giving Consignee written notice of acceptance within thirty days of the later of (i) Bakery's receipt of Consignee's written notice of proposed sale or (ii) Bakery's receipt of the full and complete application of the prospective purchaser, including all requested financial and credit information (which right is hereinafter referred to as the "Right of First Refusal").  Such notice of acceptance from Bakery shall be deemed to be an acceptance of Consignee's offer of sale, and the sale of the Distributorship, or the portion thereof offered for sale, by Consignee to Bakery, on the terms set forth in the notice of proposed sale, shall be consummated at a closing to be held within thirty days of such notice of acceptance.  Bakery's failure or refusal to exercise any Right of First Refusal hereunder does not constitute, and shall not be deemed to be, an approval by Bakery of the proposed sale or the proposed purchaser.  Any change in the identity of the proposed purchaser or in any terms of any proposed sale from those identified in any notice from Consignee to Bakery hereunder shall be deemed to be a new proposed sale with respect to which Consignee must give Bakery a new notice and a new Right of First Refusal in accordance with the terms of this Paragraph 17.

18.    SALE OF DISTRIBUTORSHIP.  The Distributorship may not be sold, conveyed or transferred by Consignee in whole or in part without the prior written approval of Bakery. Bakery will grant such approval with respect to a proposed sale if (i) Consignee has given Bakery proper and timely notice of such proposed sale as required by Paragraph 17, (ii) Bakery has not exercised, or has in writing refused to exercise, its Right of First Refusal with respect to such proposed sale, and (iii) the purchaser meets the requirements of Bakery as to character, ability, financial responsibility, business acumen, adequate facilities and involvement in the business; provided, however, that any such approval shall be conditioned upon Consignee's payment in full, prior to such sale, of all Consignee's indebtedness to Bakery. In addition, where such proposed sale involves the division of the Territory or the sale of only a portion of the Distributorship, such proposed sale is subject to, and may not be effected without, Bakery's prior written approval of the division of Territory sought to be effected thereby. Bakery will notify Consignee with reasonable promptness of its approval or disapproval of any proposed sale and, if applicable, of any proposed division of the Territory.  Any transaction or instrument which purports to constitute an assignment of this Agreement or a sale, transfer or assignment of the Distributorship, as a whole or in part, without such written approval shall be void. Any transaction or instrument which purports to constitute an assignment of this Agreement or a sale, transfer or assignment of this Distributorship, as a whole or in part, on terms that are different from those set forth in, or to a party different from the proposed purchaser identified in, the notice of proposed sale given Bakery pursuant to the terms of Paragraph 17 shall be void. Any valid sale of this Distributorship as a whole shall operate to release Consignee from all obligations to Bakery hereunder except the obligation to pay in full any adverse balance in its account with Bakery, and Bakery shall have the right in its discretion to require the purchaser to accept a new consignment agreement in substantially the same form, in lieu of continuing this Agreement in effect, in whole or in part, on an assigned basis.

19.    TERMINATION OF CONSIGNMENT AGREEMENT FOR CAUSE.  Bakery, in addition to all other remedies available to it at law or equity and to the extent permitted by law, shall have the right in its discretion to terminate this Agreement at any time, upon written notice to Consignee, for any of the following causes:

(a)    failure of Consignee adequately to realize the sales potential of the Territory and Consignee's failure to make satisfactory improvement within thirty days after notice of inadequacy from Bakery;

(b)    failure of Consignee to the perform or comply with any material term or provision of this Agreement and the continuance of such failure for seven days after written notice thereof from Bakery;

(c)    failure of Consignee to maintain the general appearance and condition of its truck(s) or other equipment, or the general appearance or deportment or that of any of its officers, directors, employees, agents, representatives, or helpers, in accordance with standards in keeping with the established reputation of Bakery and the high quality of its products and the continuance of such failure for more than five days after written notice thereof from Bakery;

(d)    any repeated failure of the type described in any of subparagraphs (a) through (c) above, even though a previous failure or failures may have been corrected after notice;

(e)    any dishonesty of Guarantor or Consignee or any of its officers, directors, employees, agents, representatives or helpers in his/her or its dealings with Bakery or with others in connection with Consignee's distribution services under this Agreement;

(f)    any actions, activities or practices of Guarantor or Consignee or any of its officers, directors, employees, agents, representatives or helpers which either do, or in the opinion of Bakery are likely to, materially damage the reputation of Bakery and/or Bakery's relations or reputation with consumers, retail stores or any other purchaser of Consigned Products;

(g)    Guarantor's or Consignee's insolvency or admission in writing of his/her or its inability to pay his/her or its debts as they mature;

(h)     the filing of voluntary bankruptcy petition by Guarantor or Consignee or his/her or its failure to vacate an involuntary bankruptcy petition within sixty days after date of filing;

(i)     failure of Guarantor or Consignee to vacate the appointment of a receiver or trustee of Guarantor's or Consignee's business or assets within sixty days after the date of appointment;

(j)     a general assignment by Guarantor or Consignee for the benefit of his/her or its creditors; or

(k)     the failure of the Guarantor to be, and at all times remain, the owner, free and clear of all liens, encumbrances and pledges, of a majority of all shares of each class of securities issued and outstanding by the Consignee, including, without limitation a majority of all voting securities, common stock or otherwise, of the Consignee.

Termination of this Agreement and the Distributorship pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except Consignee's right to receive compensation therefor in accordance with the established business practices of Bakery, and each party's right to receive any favorable balances and obligation to pay any adverse balances.

20.     BAKERY'S OPTION TO BUY DISTRIBUTORSHIP.  Bakery shall have the right in its discretion to purchase all or any portion of the Distributorship at any time upon written notice to Consignee. Bakery shall become the owner of the Distributorship, or the portion being purchased, on the date specified in the notice, whether or not a final purchase price has been agreed upon or determined, as provided below. Bakery may begin operating the Distributorship, or the portion being purchased, for its own account on such date. If Bakery elects to purchase all or any portion of the Distributorship pursuant to this Paragraph, it will pay to Consignee a sum equal to (a) the fair market value of the Distributorship, or the portion thereof being purchased, as the case may be, on the date set forth in the written notice, plus (b) 25% of such fair market value, to be determined either by agreement between Bakery and Consignee or, if they shall be unable to agree, by three arbitrators, one of whom shall be chosen by Bakery and one by Consignee and the third by the two first chosen. Each party to such arbitration shall pay all fees and expenses incurred by it in connection with such arbitration, including, without limitation, the fees and expenses of the arbitrator chosen by it; and the fees and expenses of the third arbitrator shall be shared equally by Consignee and Bakery. The determination of fair market value by a majority of the three arbitrators shall be final and binding upon both Bakery and Consignee for the purpose of this Paragraph. Notice of purchase pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except (a) the right to receive any favorable balances and the obligation to pay any adverse balances, and (b) the rights and obligations with respect to payment and arbitration stated in this Paragraph.

21.     TERMINATION OF CONSIGNMENT AGREEMENT BY CONSIGNEE.  Consignee shall have the right in its discretion to terminate this Agreement at any time upon thirty days written notice to Bakery. Termination pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except the right to receive any favorable balances and the obligation to pay any adverse balances.

22.     DEATH OF GUARANTOR; DISSOLUTION OF CONSIGNEE.

(a)     In the case of the Guarantor's death, all the terms of this Agreement (see particularly Paragraph 6) shall continue in effect during the next 90 days. If Consignee shall not have sold this distributorship pursuant to Paragraph 18 within such 90 day period, all rights and obligations hereunder of Bakery and Consignee shall terminate at the expiration of such period except (i) the right to receive any favorable balances and the obligation to pay any adverse balances, and (ii) the right of Consignee to receive and the obligation of Bakery to pay to Consignee the entire proceeds (subject, however to Bakery's lien per Paragraph 16) of any sale of this Distributorship (in whole or in part) made or contracted to be made by Bakery within the next 90 days; provided, however, that if Bakery shall have provided distribution services within all or any portion of the territory during all or any portion of the period from the expiration of the first 90 day period to the date of such sale, Bakery may deduct from the proceeds of sale any excess of its expense over income in providing such services. If Bakery provides emergency distribution service under Paragraph 6 during all or any portion of the first 90 day period, any excess of its income over expense in providing such service shall be paid to Consignee (subject to any right of setoff that may exist), but Consignee shall not be liable to Bakery or any excess of its expense over income in providing such services, although any such excess of expense may be deducted from the proceeds of sale.

(b)     In the event that the corporate existence of the Consignee shall be liquidated, dissolved or in any other way terminated or fail to remain in good standing with the state in which it is incorporated, or in the event that the Consignee shall be merged with or acquired by any other person or entity or a controlling interest in the Consignee shall be acquired by any person or entity other than Consignee, then this Agreement, and all rights and obligations of Bakery and Consignee hereunder, shall terminate immediately except (a) the right to receive any favorable balances and the obligation to pay any adverse balances, and (b) the right of Consignee to receive and the obligation of Bakery to pay to Consignee the entire proceeds (subject, however, to Bakery's lien per Paragraph 16) of any sale of this Distributorship (in whole or in part) made or contracted to be made by Bakery within the next 90 days; provided however, that if Bakery shall have provided distribution service within all or any portion of the territory during all or any portion of the period from such termination to the date of such sale, Bakery may deduct from the proceeds of sale any excess of its expense over income in providing such services.

23.     TERMINATION OF CONSIGNMENT AGREEMENT WITHOUT CAUSE.  Bakery shall have the right in its discretion to terminate this Agreement at any time without cause upon written notice to the Consignee. Upon termination pursuant to this Paragraph the Bakery will pay to the Consignee a sum equal to (a) the fair market value of the Distributorship on the termination date, plus (b) 25% of such fair market value, to be determined either by agreement between Bakery and Consignee or, if they shall be unable to agree, by three arbitrators, one of whom shall be chosen by Bakery and one by Consignee and the third by the two first chosen. Each party to such arbitration shall pay all fees and expenses incurred by it in connection with such arbitration, including, without limitation, the fees and expenses of the arbitrator chosen by it; and the fees and expenses of the third arbitrator shall be shared equally by

6

Consignee and Bakery. The determination of fair market value by a majority of the three arbitrators shall be final and binding upon both Bakery and Consignee for the purpose of this Paragraph. Termination pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except (i) the right to receive any favorable balances and the obligation to pay any adverse balances, and (ii) the rights and obligations with respect to payment and arbitration stated in this Paragraph. This Paragraph, and the rights and remedies set forth in this Paragraph, shall constitute the Consignee's sole remedy in the event of a termination of this Agreement without cause.

24.   WITHHOLDING PRODUCT.   Upon Consignee's failure to fulfill any of its obligations under this Agreement or upon the occurrence of any of the events referred to in Paragraph 19, Bakery shall have the right, without thereby terminating this Agreement, immediately to discontinue shipment of Consigned Products to Consignee until such time as Consignee shall have completely remedied such failure or occurrence, and no such discontinuance shall be, or be deemed to be, a waiver by Bakery of any of its rights or remedies under this Agreement or at law or in equity, including without limitation, the right to terminate this Agreement for the same failure or occurrence. Bakery's rights and remedies under this Paragraph shall be in addition to, and may be exercised concurrently with, all other remedies available to it under this Agreement or at law or in equity.

25.   NOTICES.   All notices which are required to or which may be given under the terms hereof shall be in writing and shall be deemed given when deposited in the United States mails, postage prepaid, and addressed to the other party at the address designated for such party on the cover page hereof. Either party may change such address by giving notice of a new address.

26.   DURATION OF CONSIGNMENT AGREEMENT.   This Agreement shall continue in effect until terminated in the manner provided in Paragraphs 19, 21, 22, or 23, until Bakery has given Consignee written notice of Bakery's election to purchase all or any portion of the Distributorship, as provided in Paragraph 20, or until Bakery has purchased all or any portion of the Distributorship pursuant to the Right of First Refusal, as provided in Paragraph 17. In the event that Bakery has given Consignee written notice of its election to purchase a portion of the Distributorship pursuant to the Right of First Refusal as provided in Paragraph 17, the parties shall promptly enter into a new Consignment Agreement in substantially the form hereof, except for the modification of the Description of Territory in Schedule A to reflect such purchase.

27.   GENERAL.   The terms of this Agreement shall be construed so as to carry into effect its true intent and meaning, and any ambiguities shall be construed and any inconsistencies shall be reconciled accordingly. Any consent, permission, authorization or waiver given hereunder with respect to any continuing act or condition may be subsequently revoked in the same manner as given. Except as expressly set forth herein, this Agreement may not be assigned by Consignee.

28.   ENTIRETY OF CONSIGNMENT AGREEMENT.   This Agreement represents the entire agreement between Bakery and Consignee and supersedes any and all prior agreements or understandings between Bakery and Consignee, whether written or oral, regarding distribution of Consigned Products. This Agreement may not be amended orally or by custom or conduct but only by a writing signed by both Bakery and Consignee.

Dated at Norwalk, Connecticut                                                                                                     July 6, 2015

This Consignment Agreement is
accepted upon the terms stated above.

CARPENTER CORE INC.                                          PEPPERIDGE FARM, INCORPORATED

By: _____                                By: _____
    Douglas M. Carpenter                                          Erin Pulito, Director
    Guarantor                                                            Distributor & Market Development

**SCHEDULE A**

ROUTE: 00039

**DESCRIPTION OF TERRITORY**

In the Commonwealth of Pennsylvania, in the Counties of Montgomery and Philadelphia; all that territory more fully described as follows:

NOTE:   Route customer's establishments "fronting" on any
thoroughfare or boundary described herein (unless
specified otherwise) deemed to belong to this territory.

Beginning at a point formed by the intersection of the Pennsylvania Turnpike and Bethlehem Pike; thence south on Bethlehem Pike, excluding all route customers, to the intersection with Bell's Mill Road; thence southwest on Bells Mill Road to the intersection with Germantown Ave thence northwest on Germantown Ave turning into Germantown Pike, excluding all route customers, to the intersection with Butler Pike; thence West on Butler Pike, excluding all route customers, to the junction with West Ridge Pike; thence north on West Ridge Pike, excluding all route customers, to the junction with Chemical Road thence south on West Ridge Pike excluding all route customers to the intersection with Fayette St; thence southeast on Fayette St to the intersection with the North Bank of the Schuylkill River; thence west on the North Bank of the Schuylkill River to the junction with the Perkiomen Creek; thence north on the easterly bank of the Perkiomen Creek, excluding all route customers, to the intersection with Egypt Road; thence east on Egypt Road, excluding all route customers, to the junction with Juniata Road; thence east on Juniata Road, excluding all route customers, to the junction with Schuylkill Avenue; thence north on Schuylkill Avenue, excluding all route customers, to the intersection with Ridge Pike; thence east on Ridge Pike to the intersection with Whitehall Road; thence north on Whitehall Road, excluding all route customers, to the intersection with Township Line Road; thence east on Township Line Road, excluding all route customers, to the intersection with Swede Road; thence north on Swede Road to the junction with DeKalb Pike; thence north on DeKalb Pike to the intersection with the Northeast Extension of the Pennsylvania Turnpike; thence southeast on the Northeast Extension of the Pennsylvania Turnpike, excluding all route customers, to the junction with the Pennsylvania Turnpike; thence east on the Pennsylvania Turnpike, excluding all route customers, to the intersection with Bethlehem Pike, the point of beginning.

Notwithstanding anything in this Consignment Agreement or the Description of Territory to the contrary, Consignee shall have no right whatsoever at any time to distribute Consigned Products to any retail stores that are, have been, or in the future be deemed to be Club Stores within the Territory described herein. For the purposes of this Consignment Agreement, the term "Club Stores" shall mean that class or type of retail store that is commonly (though not necessarily) dedicated to large sizes and bulk sales to consumer who may be required to pay a membership fee to shop therein (e.g., Costco, Sam's Club, BJ's, etc.). It is agreed and understood by Consignee that Bakery shall have the exclusive right to distribute Consigned Products to all Club Stores that have existed, currently exist or in the future my exist in the Territory.

APPROVED:  JULY 6, 2015

APPROVED:  JULY 6, 2015

PEPPERIDGE FARM, INCORPORATED

_Douglas Carpenter_
DOUGLAS CARPENTER
CONSIGNEE

_Erin Pulito_
ERIN PULITO
DIRECTOR
MARKET & DISTRIBUTOR DEVELOPMENT



DOUGLAS CARPENTER PURCHASING ADRIAN ZAMICHIELI EFFECTIVE 7/6/15

# EXHIBIT B

2001 – CORPORATION / LLC

# PEPPERIDGE FARM

# CONSIGNMENT AGREEMENT

### * * *

**PEPPERIDGE FARM, INCORPORATED**
**595 WESTPORT AVENUE**
**NORWALK, CONNECTICUT  06851-4482**

**HEREBY GRANTS**

**AN**

**EXCLUSIVE DISTRIBUTORSHIP**

**TO**

**DISTRIBUTOR NAME: WAREHOUSE TRAINERS INC.**

**DISTRIBUTOR ADDRESS:** REDACTED **, Langhorne, PA 19047**

**AS A**
**CONSIGNEE**
**WITHIN THE TERRITORY AND UPON THE**
**TERMS STATED IN THE FOLLOWING PAGES**

**WITH GUARANTY BY**

**GUARANTOR NAME: Daniel Kletcheck**

**GUARANTOR ADDRESS:** REDACTED **, Langhorne, PA 19047**

**AS GUARANTOR**

CA01CORP

**DEFINITIONS**

(a)   BAKERY ——— refers to PEPPERIDGE FARM, INCORPORATED, the grantor of the Distributorship, a Connecticut corporation having its principal office in Norwalk, Connecticut.

(b)   CONSIGNEE ——— refers to the grantee of this Distributorship identified on the cover page of this Agreement.

(c)   TERRITORY ——— refers to the territory described in Schedule A hereto.

(d)   CONSIGNED PRODUCTS ——— refers to those products listed in Schedule B hereto (subject to modification per Paragraph 10) but only when packaged or wrapped in retail packaging under the brand name "Pepperidge Farm" and sold or intended to be sold to retail stores as fresh (i.e. not preserved or stale), first quality (i.e. not Seconds) merchandise and does not include (1) any of such products sold, or intended to be sold to retail stores, frozen, refrigerated, canned, or otherwise preserved, (2) any of such products sold, or intended to be sold, to retail stores in a raw or uncooked state, (3) any of such products sold, or intended to be sold, to retail stores in bulk for resale by such retail stores at an in-store bakery or at a food-service counter or food-service section located within such retail store, (4) Stale Products, (5) Seconds, (6) merchandise of others containing Consigned Products as components, (7) any of such products packaged or wrapped in food-service or other non-retail packaging or (8) any of such products packaged, wrapped or sold under any brand name other than "Pepperidge Farm."

(e)   STALE PRODUCTS ——— refers to Consigned Products whose shelf life has expired, as determined by Bakery's stale policy existing from time to time.

(f)   SECONDS ——— refers to Consigned Products which do not meet the high standards required by Bakery for distribution in the ordinary manner and thus are deemed by Bakery, in its sole discretion, to be unsuitable for that purpose.

(g)   DISTRIBUTION OR DISTRIBUTE ——— refers to the sale and delivery of Consigned Products to retail stores within the Territory and to such hotels, restaurants, etc., as may be authorized by Bakery per Paragraph 9.

(h)   BULLETIN PRICES ——— refers to the prices for Consigned Products charged by Bakery and published from time to time.

(i)   CHAIN ——— refers to any person, firm, corporation or other legal entity that owns or operates three or more retail stores.

(j)   DISTRIBUTION – refers to the distribution rights described in, and established under, this Agreement.

(k)   GUARANTOR ———refers to the guarantor of Consignee's duties and obligations under this Agreement identified on the cover page hereof.

**TERMS**

1.   EXCLUSIVE OF DISTRIBUTORSHIP.  Consignee will have the exclusive right to distribute Consigned Products to retail stores within the Territory, and Bakery will not sell or deliver or authorize any others to sell or deliver Consigned Products to retail stores (except for the in-store bakeries, food-service counters and food-service sections located in retail stores) within the Territory except in connection with temporary sales programs and except for sales to direct customers pursuant to orders solicited by Consignee under Paragraph 3 (b); provided, however, that Bakery will have the exclusive right to distribute Consigned Products to retail facilities owned or operated by Bakery or by any corporation controlled by Bakery.  The terms of this Paragraph are subject, however, to the terms of Paragraphs 6, 7, and 9.

2.   QUANTITIES CONSIGNED.  Bakery will consign and deliver to Consignee at such locations as shall, from time to time, be designated by Bakery, and Consignee will accept sufficient quantities of Consigned Products to maintain at all times, an adequate and fresh supply thereof in all retail stores in the Territory which request such products and whose accounts are not demonstrably unprofitable; provided, however, Bakery reserves the right to allocate its products as nearly proportionately as practicable if the overall demand for its products exceeds its production.  Consignee shall hold and care for all Consigned Products as the sole and exclusive property of Bakery.  Title to all Consigned Products shall be vested in, subject to, and under the control of Bakery until delivered by Consignee to a purchaser.  Consignee shall not encumber or grant any security interest in or lien on, or by action or inaction cause or allow any encumbrance, security interest or lien to be imposed upon, the Consigned Products.

3.   PROCEEDS AND RECORDS OF SALE.

(a)   Except as provided in subparagraph (b), Consigned Products shall be consigned to Consignee at Bulletin Prices, less the percentage specified in Schedule B, for sale and delivery to retail stores at such prices as Consignee may determine.

(b)   Bakery may bill directly any Chains and military commissaries that have requested such direct billing or that request it in the future.  Such directly billed stores in the Territory will be direct customers of Bakery, and Consignee will solicit sales from them and receive product for delivery to them on Bakery's behalf at Bulletin Prices.  Bakery assumes all credit risks with respect to Chains and military commissaries which receive such direct billing.  The funds owed by such chains and military commissaries as a result of the Consigned Products delivered are accounts receivable of, and debts payable to, Bakery and are not the property of Consignee.  Consignee shall have the exclusive right to perform the service of delivery of Consigned Products to such customers of Bakery and Bakery shall not effect such delivery except through Consignee, subject to the provisions of Paragraphs 1, 6, 7, and 9.  For the performance of its services of solicitation and delivery under this subparagraph (b), Consignee, if it shall have made prompt and timely delivery of all charge tickets as required by subparagraph (d) (2), shall be paid a percentage of net proceeds payable to Bakery by the direct billing customers, such percentage to be calculated at the rate specified in Schedule B.

(c)   Bakery may from time to time extend credit to Consignee for Consigned Products to be sold to retail stores on credit extended by Consignee; provided Bakery has approved in advance the stores to receive such credit and the amount and terms thereof.  Notwithstanding the foregoing, any credit extended by Consignee shall be at Consignee's risk.

(d)   (1)   Consignee shall pay promptly each week on the day specified by Bakery for all Consigned Products sold and delivered by Consignee during the preceding week, less any amounts which would be otherwise due on such sales as to which Bakery

shall have extended credit to Consignee under (c) above, plus any amounts becoming due during such week under the terms of credit extended during any previous week.

(2) Consignee shall promptly deliver to Bakery on such days as Bakery may specify all charge tickets for all deliveries of Consigned Products to direct customers of Bakery for direct billing by Bakery.

(e) Consignee will keep such records of Consigned Products received and sales and deliveries made as Bakery may from time to time reasonably request; Bakery may inspect such records and Consigned Products at such times as Bakery may select. Without limiting the generality of the foregoing, Consignee agrees that Bakery may take physical inventory of Consigned Products in Consignee's possession whenever and as often as Bakery deems advisable and that Consignee will keep such records of its operation and will furnish Bakery such copies thereof as Bakery may reasonably require.

4.   DISTRIBUTION EFFORTS.  Consignee will use its best efforts to realize the full sales potential of the Territory for Consigned Products.  To this end, Consignee will (a) actively solicit all retail stores in the Territory whose accounts can by profitably handled, (b) maintain at all times an adequate and fresh supply of Consigned Products in all such retail stores, (c) provide distribution service to all such retail stores on such days of the week (including weekends), at such intervals and with such frequency as is necessary to realize the full sales potential thereof and to maintain an adequate and fresh supply of Consigned Products therein, (d) make available to all such retail stores all varieties of authorized Consigned Products unless it is demonstrably unprofitable to do so, (e) cooperate with Bakery in the effective utilization of Bakery's advertising, sales promotion and space merchandising programs and (f) keep fully informed of Bakery's recommended policies and methods for increasing sales and improving distribution service. Consignee may sell or distribute other products, not competitive with Consigned Products, so long as such sale or distribution does not otherwise violate any terms or conditions of this Agreement or interfere with Consignee's performance of its obligations under the terms of this Agreement.  Bakery may, from time to time, establish reasonable sales and/or distribution goals for Consignee and this Distributorship.  Consignee shall either meet or exceed such goals.

5.   DISTRIBUTION SERVICE AND FACILITIES.  Consignee will maintain efficient distribution service throughout the Territory in keeping with the established reputation of Bakery and the high quality of its products.  To this end, Consignee will (a) provide adequate equipment and, if not otherwise provided by Bakery, facilities for the receipt, handling and delivery of Consigned Products and the accounting, inventory and billing thereof, including, without limitation, such computer and/or other systems as may be necessary or appropriate therefor and (b) comply with all laws and regulations relating either directly or indirectly to the operation or ownership of the Distributorship, including, without limitation, motor vehicle, food, drug, health and sanitary laws and regulations and (c) maintain such route books and other records as are required by Bakery from time to time. Pursuant to the foregoing, Consignee shall provide, and shall maintain in good and proper working condition and appearance, a delivery truck(s), computer and such other equipment as, from time to time, shall be necessary for the operation of the Distributorship.  Consignee shall maintain the general appearance and condition of such truck(s), computer and other equipment, as well as the appearance and deportment of all Consignee's officers, directors, employees, agents, representatives and helpers, in accordance with the established reputation of Bakery and the high quality of its products.

6.   EMERGENCY SERVICE.  If, by reason of illness or vacation or any other cause, Consignee shall be unable at any time to provide or maintain the efficient distribution service contemplated by this Agreement, Consignee will make other suitable arrangements at its own expense for the provision and/or maintenance of such service; but if Consignee is unable or fails to do so, Bakery is authorized in its discretion to provide and/or maintain such service as Consignee's agent and at Consignee's expense and risk.  Upon the request of Consignee, Bakery will endeavor in any emergency to provide and/or maintain such service as Consignee's agent and at Consignee's expense and risk.

7.   FAILURE TO SERVICE PARTICULAR STORES.  If Consignee fails for any reason to provide or maintain satisfactory distribution service to any segment of the Territory or to any retail store within the Territory, and such failure is not remedied within five days after written notice thereof from Bakery, Bakery, in addition to the other remedies available to it hereunder, may make other arrangements, on either a permanent or temporary basis, in the discretion of Bakery, for the service of such store or segment of the Territory, as the case may be.  If such arrangements for service are made on a permanent basis, the retail store or segment of the Territory involved shall be deemed to be no longer included in the Territory and Schedule A shall be modified accordingly, all without compensation or remuneration to Consignee.

8.   CHAIN STORE ACCOUNTS.  If any Chain requires that authorization for the distribution of Consigned Products to the Chain's retail stores in the Territory shall be obtained through a central or district office located outside of the Territory, or only in conjunction with the distribution of Consigned Products to its retail stores in other territories, Bakery will cooperate with Consignee in procuring such authorization.  If any Chain refuses to pay or to permit store managers to pay any Consignee directly for Consigned Products and, instead, requires the submission of a consolidated bill to a central or district office of the Chain, Bakery will handle the billing, and the terms of Paragraph 3 (b) shall apply.

9.   PROHIBITED SALES AND DELIVERIES.  Consignee will not sell or deliver any Consigned Products, or any products listed in Schedule B, directly to consumers or to any other purchasers except retail stores (exclusive of the in-store bakeries, food-service counters and food-service sections located in such retail stores) within the Territory and such hotels, restaurants, clubs and similar organizations within the Territory as Bakery may authorize in writing.  Also, Consignee will not, without like authorization, make deliveries of Consigned Products to any Chain via a central or district warehouse or in any manner other than directly to its retail stores.  If, despite the good faith efforts of Consignee and Bakery to obtain permission from any Chain to make deliveries directly to its retail stores, such Chain refuses to handle Consigned Products except via warehouse deliveries, Bakery shall have the right in its discretion to sell and deliver the Consigned Products directly to such chain for its own account via warehouse deliveries as long as such refusal remains in effect.  In addition, Consignee shall, if requested to do so in writing by Bakery, on a non-exclusive basis and for the period

of time set forth in such written request, distribute products listed in Schedule B (as modified from time to time pursuant to Paragraph 10) to in-store bakeries and to food-service counters and food-service sections located in retail stores in the Territory.

10.    MODIFICATION OF LIST PRODUCTS.  The list of Consigned Products set forth in Schedule B hereto may be modified or changed by Bakery from time to time by (a) adding such other products as it may deem advisable among those which it now or hereafter produces, (b) withdrawing within any sales district or other geographic area any Consigned Products (whether originally listed or subsequently added) which it discontinues producing or which it discontinues selling in such sales district or other geographic area or (c) adding or withdrawing at any time with or without notice and for any reason any product designated as "test product," "for market test" or the like.  In addition, Bakery shall have the right from time to time to change the ingredients, the method of production or the labeling or packaging of any Consigned Products.  In addition, if Consignee fails to comply with the terms and conditions of this Agreement with respect to any Consigned Product or Consigned Products, then Bakery may, in addition to any other remedies available to it hereunder, if such failure shall continue for a period of thirty days after written notice thereof from Bakery, without compensation or remuneration to Consignee, delete such Consigned Product or Consigned Products from Schedule B, in which event Consignee's right to distribute such deleted Consigned Products under the terms of this Agreement shall immediately terminate.

11.    SALES DATA.  Consignee will furnish to Bakery such sales data as it may reasonably require for the planning of its production schedules, the expansion of its operations and the planning and conduct of sales promotion programs.

12.    TRADE NAME, ETC.  Consignee may use Bakery's trade name, trademark and distinguishing colors on its truck(s) and other equipment and supplies; provided, however, that (a) Bakery's trade name may not be used as a part of any business name or trade name of Consignee without the written consent of Bakery or in any other way which will tend to confuse the separate identities of Bakery and Consignee, and (b) Bakery shall have the right at any time to revoke the permission granted in this Paragraph if, in its opinion, the general appearance of Consignee's truck(s) or other equipment or the general appearance or deportment of all Consignee's officers, directors, employees, agents, representatives and helpers, shall fall below standards in keeping with the established reputation of Bakery and the high quality of its products.

13.    INSURANCE AND INDEMNIFICATION.  Consignee shall, at Consignee's expense, maintain adequate public liability, property damage and, where appropriate, workers' compensation insurance to protect Bakery and Consignee against any and all claims of personal injury, death or property damage, other than damage to Consigned Products in possession of Consignee.  Such insurance shall be in such amounts and have such limits as shall be acceptable to Bakery or required by the retail stores in the Territory, whichever is greater, shall name Baker as an additional insured thereunder and shall provide that the insurance shall not be terminated without at least fifteen (15) days' prior written notice to Bakery.  Consignee shall, prior to the date of execution of this Agreement, and at least annually thereafter, provide Bakery with insurance certificates evidencing such coverage.  If Consignee fails to obtain or to maintain the insurance coverage required by this Paragraph, Bakery may, at its option, purchase such insurance coverage on behalf of Consignee, and Consignee shall reimburse Bakery in full for the cost thereof.  Consignee covenants and agrees to indemnify, defend and save Bakery harmless from and against any and all claims relating to payroll, unemployment compensation, employee benefits, personal injury, death, or property damage (other than damage to Consigned Products in the possession of Consignee) caused or alleged to have been caused directly or indirectly by or as a result of the actions of Consignee or any of its officers, directors, employees, agents, representatives or helpers, or by or as a result of the operation of the Distributorship or any vehicle or equipment owned or used by Consignee or any of its officers, directors, employees, agents, representatives or helpers, and any and all losses, damages, liabilities and expenses (including attorney's fees) incurred by Bakery as a result thereof.  Anything in this Agreement to the contrary notwithstanding, this indemnification provision shall survive any termination of this Agreement.

14.    NON-PERFORMANCE FOR REASONS BEYOND CONTROL.  Neither Bakery nor Consignee shall be liable for any failure to comply with the terms of this Agreement if such failure shall have been caused primarily by fire, labor dispute, strike, war, insurrection, governmental restriction or any other cause beyond the control of the party so failing.

15.    INDEPENDENT CONTRACTOR.  Consignee is a self-employed independent contractor, not an agent or employee of Bakery, and has no authority other than to distribute products consigned hereunder and to solicit orders for and make deliveries of Consigned Products in the case of direct sales of Bakery under Paragraph 3 (b), express or implied, to do or perform any act or thing or to make any warranty or representation or promise or commitment of any character which will be binding upon Bakery or for which it will be responsible, and Consignee will refrain from any conduct inconsistent with the terms of this Paragraph 15.  Consignee may, at its own expense and risk, employ such persons as Consignee shall deem appropriate to assist in the performance of Consignee's obligations under the terms of this Agreement; and Consignee shall be responsible for the hiring, firing, training and supervision of, and all remuneration and benefits for, any person so employed.  The independent contractor relationship between Bakery and Consignee is an essential element of this Agreement.  The discount percentage and commission rate described in Paragraph 3 and the percentages established pursuant to Schedule B or any similar schedule under this Agreement are based in substantial part on such independent contractor relationship and the understanding that the Bakery is not obligated to pay any FICA, income or similar tax or withholding for or on behalf of the Consignee.

16.    LIEN OF BAKERY ON DISTRIBUTORSHIP.  Bakery shall have a first lien on the Distributorship and all proceeds of the Distributorship as security for all indebtedness of Consignee to Bakery at any time outstanding.  Any sale, transfer or assignment of the Distributorship (invalid per Paragraph 18 without the written approval of Bakery) shall be subject to such lien unless such lien shall be expressly released by Bakery in writing.  Consignee shall not, without the prior written consent of Bakery, encumber or grant any security interest in or lien upon, or by its action or inaction cause or allow any encumbrance, security interest or lien to be imposed upon this Distributorship, other than the lien imposed by this Paragraph 16; and it is expressly agreed that Bakery shall have no obligation whatsoever to consent to any such encumbrance, security interest or lien unless and until the proposed lienholder shall have agreed in writing to subordinate its lien, encumbrance or security interest to the lien created by this Paragraph 16.  Bakery's consent to any such

encumbrance, security interest or lien which has been so subordinated to the lien of Bakery established pursuant to this Paragraph 16 shall not be unreasonably withheld.

17.     RIGHT OF FIRST REFUSAL.  Consignee must give Bakery written notice of each proposed sale, conveyance or transfer (hereinafter "proposed sale") of all or any portion of this Distributorship, which notice shall identify the prospective purchaser and the terms and conditions of the proposed sale.  Such notice of proposed sale from Consignee shall be deemed to be an irrevocable offer to sell the Distributorship, or the portion thereof described in such notice of proposed sale, to Bakery on the terms and conditions set forth therein.  Bakery shall have the right, but not the obligation, to accept such offer by giving Consignee written notice of acceptance within thirty days of the later of (i) Bakery's receipt of Consignee's written notice of proposed sale or (ii) Bakery's receipt of the full and complete application of the prospective purchaser, including all requested financial and credit information (which right is hereinafter referred to as the "Right of First Refusal").  Such notice of acceptance from Bakery shall be deemed to be an acceptance of Consignee's offer of sale, and the sale of the Distributorship, or the portion thereof offered for sale, by Consignee to Bakery, on the terms set forth in the notice of proposed sale, shall be consummated at a closing to be held within thirty days of such notice of acceptance.  Bakery's failure or refusal to exercise any Right of First Refusal hereunder does not constitute, and shall not be deemed to be, an approval by Bakery of the proposed sale or the proposed purchaser.  Any change in the identity of the proposed purchaser or in any terms of any proposed sale from those identified in any notice from Consignee to Bakery hereunder shall be deemed to be a new proposed sale with respect to which Consignee must give Bakery a new notice and a new Right of First Refusal in accordance with the terms of this Paragraph 17.

18.     SALE OF DISTRIBUTORSHIP.  The Distributorship may not be sold, conveyed or transferred by Consignee in whole or in part without the prior written approval of Bakery.  Bakery will grant such approval with respect to a proposed sale if (i) Consignee has given Bakery proper and timely notice of such proposed sale as required by Paragraph 17, (ii) Bakery has not exercised, or has in writing refused to exercise, its Right of First Refusal with respect to such proposed sale and (iii) the purchaser meets the requirements of Bakery as to character, ability, financial responsibility, business acumen, adequate facilities and involvement in the business; provided, however, that any such approval shall be conditioned upon Consignee's payment in full, prior to such sale, of all Consignee's indebtedness to Bakery.  In addition, where such proposed sale involves the division of the Territory or the sale of only a portion of the Distributorship, such proposed sale is subject to, and may not be effected without, Bakery's prior written approval of the division of Territory sought to be effected thereby.  Bakery will notify Consignee with reasonable promptness of its approval or disapproval of any proposed sale and, if applicable, of any proposed division of the Territory.  Any transaction or instrument which purports to constitute an assignment of this Agreement or a sale, transfer or assignment of the Distributorship, as a whole or in part, without such written approval shall be void.  Any transaction or instrument which purports to constitute an assignment of this Agreement or a sale, transfer or assignment of this Distributorship, as a whole or in part, on terms that are different from those set forth in, or to a party different from the proposed purchaser identified in, the notice of proposed sale given Bakery pursuant to the terms of Paragraph 17 shall be void.  Any valid sale of this Distributorship as a whole shall operate to release Consignee from all obligations to Bakery hereunder except the obligation to pay in full any adverse balance in its account with Bakery, and Bakery shall have the right in its discretion to require the purchaser to accept a new consignment agreement in substantially the same form, in lieu of continuing this Agreement in effect, in whole or in part, on an assigned basis.

19.     TERMINATION OF CONSIGNMENT AGREEMENT FOR CAUSE.  Bakery, in addition to all other remedies available to it at law or equity and to the extent permitted by law, shall have the right in its discretion to terminate this Agreement at any time, upon written notice to Consignee, for any of the following causes:

(a)     failure of Consignee adequately to realize the sales potential of the Territory and Consignee's failure to make satisfactory improvement within thirty days after notice of inadequacy from Bakery;

(b)     failure of Consignee to the perform or comply with any material term or provision of this Agreement and the continuance of such failure for seven days after written notice thereof from Bakery;

(c)     failure of Consignee to maintain the general appearance and condition of its truck(s) or other equipment or the general appearance or deportment or that of any of its officers, directors, employees, agents, representatives or helpers, in accordance with standards in keeping with the established reputation of Bakery and the high quality of its products and the continuance of such failure for more than five days after written notice thereof from Bakery;

(d)     any repeated failure of the type described in any of subparagraphs (a) through (c) above, even though a previous failure or failures may have been corrected after notice;

(e)     any dishonesty of Guarantor or Consignee or any of its officers, directors, employees, agents, representatives or helpers in his/her or its dealings with Bakery or with others in connection with Consignee's distribution services under this Agreement;

(f)     any actions, activities or practices of Guarantor or Consignee or any of its officers, directors, employees, agents, representatives or helpers which either do, or in the opinion of Bakery are likely to, materially damage the reputation of Bakery and/or Bakery's relations or reputation with consumers, retail stores or any other purchaser of Consigned Products;

(g)     Guarantor's or Consignee's insolvency or admission in writing of his/her or its inability to pay his/her or its debts as they mature;

(h)     the filing of voluntary bankruptcy petition by Guarantor or Consignee or his/her or its failure to vacate an involuntary bankruptcy petition within sixty days after date of filing;

(i)     failure of Guarantor or Consignee to vacate the appointment of a receiver or trustee of Guarantor's or Consignee's business or assets within sixty days after the date of appointment; or

(j)     a general assignment by Guarantor or Consignee for the benefit of his/her or its creditors.

(k)     the failure of the Guarantor to be, and at all times remain, the owner, free and clear of all liens, encumbrances and pledges, of a majority of all shares or membership interests of each class of securities or membership interests issued and outstanding by the Consignee, including, without limitation a majority of all voting securities, common stock or otherwise, of the Consignee.
Termination of this Agreement and the Distributorship pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except Consignee's right to receive compensation therefor in accordance with the established business practices of Bakery, and each party's right to receive any favorable balances and obligation to pay any adverse balances.

20.   BAKERY'S OPTION TO BUY DISTRIBUTORSHIP.  Bakery shall have the right in its discretion to purchase all or any portion of the Distributorship at any time upon written notice to Consignee.  Bakery shall become the owner of the Distributorship, or the portion being purchased, on the date specified in the notice, whether or not a final purchase price has been agreed upon or determined, as provided below.  Bakery may begin operating the Distributorship, or the portion being purchased, for its own account on such date. If Bakery elects to purchase all or any portion of the Distributorship pursuant to this Paragraph, it will pay to Consignee a sum equal to (a) the fair market value of the Distributorship, or the portion thereof being purchased, as the case may be, on the date set forth in the written notice plus (b) 25% of such fair market value, to be determined either by agreement between Bakery and Consignee or, if they shall be unable to agree, by three arbitrators, one of whom shall be chosen by Bakery and one by Consignee and the third by the two first chosen.  Each party to such arbitration shall pay all fees and expenses incurred by it in connection with such arbitration, including, without limitation, the fees and expenses of the arbitrator chosen by it; and the fees and expenses of the third arbitrator shall be shared equally by Consignee and Bakery.  The determination of fair market value by a majority of the three arbitrators shall be final and binding upon both Bakery and Consignee for the purpose of this Paragraph.  Notice of purchase pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except (a) the right to receive any favorable balances and the obligation to pay any adverse balances and (b) the rights and obligations with respect to payment and arbitration stated in this Paragraph.

21.   TERMINATION OF CONSIGNMENT AGREEMENT BY CONSIGNEE.  Consignee shall have the right in its discretion to terminate this Agreement at any time upon thirty days written notice to Bakery.  Termination pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except the right to receive any favorable balances and the obligation to pay any adverse balances.

22.   DEATH OF GUARANTOR; DISSOLUTION OF CONSIGNEE.

(a)     In the case of the Guarantor's death, all the terms of this Agreement (see particularly Paragraph 6) shall continue in effect during the next 90 days.  If Consignee shall not have sold this distributorship pursuant to Paragraph 18 within such 90 day period, all rights and obligations hereunder of Bakery and Consignee shall terminate at the expiration of such period except (i) the right to receive any favorable balances and the obligation to pay any adverse balances and (ii) the right of Consignee to receive and the obligation of Bakery to pay to Consignee the entire proceeds (subject, however to Bakery's lien per Paragraph 16) of any sale of this Distributorship (in whole or in part) made or contracted to be made by Bakery within the next 90 days; provided, however, that if Bakery shall have provided distribution services within all or any portion of the territory during all or any portion of the period from the expiration of the first 90 day period to the date of such sale, Bakery may deduct from the proceeds of sale any excess of its expense over income in providing such services.  If Bakery provides emergency distribution service under Paragraph 6 during all or any portion of the first 90 day period, any excess of its income over expense in providing such service shall be paid to Consignee (subject to any right of setoff that may exist), but Consignee shall not be liable to Bakery or any excess of its expense over income in providing such services, although any such excess of expense may be deducted from the proceeds of sale.

(b)     In the event that the corporate existence of the Consignee shall be liquidated, dissolved or in any other way terminated or fail to remain in good standing with the state in which it is incorporated, or in the event that the Consignee shall be merged with or acquired by any other person or entity or a controlling interest in the Consignee shall be acquired by any person or entity other than Consignee, then this Agreement, and all rights and obligations of Bakery and Consignee hereunder, shall terminate immediately except (a) the right to receive any favorable balances and the obligation to pay any adverse balances and (b) the right of Consignee to receive and the obligation of Bakery to pay to Consignee the entire proceeds (subject, however, to Bakery's lien per Paragraph 16) of any sale of this Distributorship (in whole or in part) made or contracted to be made by Bakery within the next 90 days; provided however, that if Bakery shall have provided distribution service within all or any portion of the territory during all or any portion of the period from such termination to the date of such sale, Bakery may deduct from the proceeds of sale any excess of its expense over income in providing such services.

23.   TERMINATION OF CONSIGNMENT AGREEMENT WITHOUT CAUSE.  Bakery shall have the right in its discretion to terminate this Agreement at any time without cause upon written notice to the Consignee.  Upon termination pursuant to this Paragraph the Bakery will pay to the Consignee a sum equal to (a) the fair market value of the Distributorship on the termination date plus (b) 25% of such fair market value, to be determined either by agreement between Bakery and Consignee or, if they shall be unable to agree, by three arbitrators, one of whom shall be chosen by Bakery and one by Consignee and the third by the two first chosen.  Each party to such arbitration shall pay all fees and expenses incurred by it in connection with such arbitration, including, without limitation, the fees and expenses of the arbitrator chosen by it; and the fees and expenses of the third arbitrator shall be shared equally by Consignee and Bakery.  The determination of fair market value by a majority of the three arbitrators shall be final and binding upon both Bakery and Consignee for the purpose of this Paragraph.  Termination pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except (i) the right to receive any favorable balances and the obligation to pay any adverse balances and (ii) the rights and obligations with respect to payment and arbitration stated in this Paragraph.  This Paragraph, and the rights and remedies set forth in this Paragraph, shall constitute the Consignee's sole remedy in the event of a termination of this Agreement without cause.

24.   WITHHOLDING PRODUCT.  Upon Consignee's failure to fulfill any of its obligations under this Agreement or upon the occurrence of any of the events referred to in Paragraph 19, Bakery shall have the right, without thereby terminating this Agreement,

CA01CORP

immediately to discontinue shipment of Consigned Products to Consignee until such time as Consignee shall have completely remedied such failure or occurrence, and no such discontinuance shall be, or be deemed to be, a waiver by Bakery of any of its rights or remedies under this Agreement or at law or in equity, including without limitation, the right to terminate this Agreement for the same failure or occurrence.  Bakery's rights and remedies under this Paragraph shall be in addition to, and may be exercised concurrently with, all other remedies available to it under this Agreement or at law or in equity.

25.    NOTICES.  All notices which are required to or which may be given under the terms hereof shall be in writing and shall be deemed given when deposited in the United States mails, postage prepaid, and addressed to the other party at the address designated for such party on the cover page hereof.  Either party may change such address by giving notice of a new address.

26.    DURATION OF CONSIGNMENT AGREEMENT.  This Agreement shall continue in effect until terminated in the manner provided in Paragraphs 19, 21, 22 or 23, until Bakery has given Consignee written notice of Bakery's election to purchase all or any portion of the Distributorship, as provided in Paragraph 20, or until Bakery has purchased all or any portion of the Distributorship pursuant to the Right of First Refusal, as provided in Paragraph 17.  In the event that Bakery has given Consignee written notice of its election to purchase a portion of the Distributorship pursuant to the Right of First Refusal as provided in Paragraph 17, the parties shall promptly enter into a new Consignment Agreement in substantially the form hereof, except for the modification of the Description of Territory in Schedule A to reflect such purchase.

27.    GENERAL.  The terms of this Agreement shall be construed so as to carry into effect its true intent and meaning, and any ambiguities shall be construed and any inconsistencies shall be reconciled accordingly.  Any consent, permission, authorization or waiver given hereunder with respect to any continuing act or condition may be subsequently revoked in the same manner as given.  Except as expressly set forth herein, this Agreement may not be assigned by Consignee.

28.    ENTIRETY OF CONSIGNMENT AGREEMENT.  This Agreement represents the entire agreement between Bakery and Consignee and supersedes any and all prior agreements or understandings between Bakery and Consignee, whether written or oral, regarding distribution of Consigned Products.  This Agreement may not be amended orally or by custom or conduct but only by a writing signed by both Bakery and Consignee.

Dated at Norwalk, Connecticut **May 21, 2018**

This Consignment Agreement is
Accepted upon the terms stated above.


**WAREHOUSE TRAINERS INC.**                    **PEPPERIDGE FARM, INCORPORATED**



By: _____          By: _____
    Daniel Kletcheck                                           Erin Pulito
Its: <u>President</u>                                        Its: <u>Director, Distributor & Market Development</u>

## SCHEDULE A

## DESCRIPTION OF TERRITORY

In the Commonwealth of Pennsylvania, all that territory more fully described as follows:

NOTE: Retail Stores "fronting" on any thoroughfare or boundary described herein (unless specified otherwise) are deemed to belong to this distributorship territory. The term "fronting" as used in this Description of Territory shall have the same meaning as "facing." Unless specified otherwise, a Retail Store is deemed to be "fronting" the road on which its primary mailing address is located.

### PART A

Beginning at a point formed by the junction of Route 413 and State Road;
thence southwest on State Road to the Bucks / Philadelphia County Lines (Poquessing Creek);
thence north along the Bucks / Philadelphia County Lines (Poquessing Creek) to the intersection with Route 13 (Bristol Pike);
thence northeast on Route 13 (Bristol Pike) to the intersection with Interstate 95;
thence northeast on Interstate 95, excluding all route customers on the west, to the intersection with Ford Road
thence east on Ford Road, excluding all route customers to the north, to the junction with Bath Road;
thence southeast and south on Bath Road excluding all route customers to the northeast and east, to the junction with Fayette Drive;
thence southwest on Fayette Drive to the intersection with Winder Drive;
thence west on Winder Drive to the junction with Route 413 (Veteran's Highway);
thence south on Route 413 excluding all route customers to the east, to the junction with State Road, the point of beginning.

### PART B

Beginning at the point formed by Interstate 95 and Big Oak Road
thence east on Big Oak road, excluding all route customers to the north, to the intersection with Makefield Road;
thence southeast on Makefield Road to the intersection with Woolston Drive;
thence west and continuing south on Woolston Drive to intersection with Business US1 (Lincoln Highway);
thence west on Business US1 (Lincoln Highway), excluding all route customers to the intersection with North Olds Boulevard;
thence south on North Olds Blvd, excluding all route customers to the east, to the junction with Trenton Road;
thence southwest on Trenton Road, excluding all route customers to the east, to the junction with Bristol-Oxford Valley Road;
thence south on Bristol-Oxford Valley Road, excluding all route customers to the east, to the intersection with New Falls Road;
thence west on New Falls Road, excluding all route customers to the south, to the junction with Plumbridge Drive;
thence southwest on Plumbridge Drive to the junction with Route 413 (Veteran's Highway);
thence south on Route 413 (Veteran's Highway) to the intersection with I-276 (The Pennsylvania Turnpike);
thence west on I-276 (The Pennsylvania Turnpike), excluding all route customers to the south, to the intersection with I-95;
thence north on I-95 to the intersection with Big Oak Road, the point of beginning.

Notwithstanding anything in this Consignment Agreement or the Schedule A, Description of Territory to the contrary, Distributor shall have no right whatsoever at any time to distribute Consigned Products to any retail stores that are, have been, or in the future be deemed to be Club Stores within the Territory described herein. For the purposes of this Consignment Agreement, the term "Club Stores" shall mean that class or type of retail store that is commonly (though not necessarily) dedicated to large sizes and bulk sales to consumer who may be required to pay a membership fee to shop therein (e.g., Costco, Sam's Club, BJ's, etc.). It is agreed and understood by Consignee that Bakery shall have the exclusive right to distribute Consigned Products to all Club Stores that have existed, currently exist or in the future may exist in the Territory.

Dated: **May 21, 2018**

APPROVED:

**WAREHOUSE TRAINERS INC.**

APPROVED:

**PEPPERIDGE FARM, INCORPORATED**

By: _____
    Daniel Kletcheck
Its: President

By: _____
    Erin Pulito
Its: Director, Distributor & Market Development

CA01CORP

8

## MAP IMAGE

*This map is for illustrative purposes only.*



## SCHEDULE B

## LIST OF CONSIGNED PRODUCTS
## (SUBJECT TO MODIFICATION PER PARAGRAPH 10)

SCHEDULE B
LIST OF CONSIGNED PRODUCTS
(SUBJECT TO MODIFICATION PER PARAGRAPH 10)

**Milano**
7412 Milano
7435 Orange Milano
7472 Double Chocolate Milano
7481 Raspberry Milano
7567 Milk Chocolate Milano
7947 Mint Milano
8735 Amaretto Milano
8736 Black & White Milano
9038 Chocolate Raspberry Milano
9043 Chocolate Mint Milano

**Entertaining - Boxed Cookies**
7233 Distinctive Selection Large (18 ct)
7521 Golden Orchard Assortment
7704 Ginger Family (18ct)
7912 9 Cup Assortment Holiday Shipper (24 CT)
8310 Chocolate Collection

**Entertaining – Pirouettes**
8781 Mint Chocolate Pirouette
8782 Chocolate Fudge Pirouette
8783 Chocolate Hazelnut Pirouette
8784 French Vanilla Pirouette

**Chocolate Drenched**
9006 Milk Chocolate Drenched Milano
9007 Dark Chocolate Drenched Milano
9008 Chocolate Drenched Mint Milano
9009 Chocolate Drenched Milano Shipper

**Gifting**
9021 Holiday Gift Box

**Other Distinctive Bag**
7410 Bordeaux
7419 Geneva
7420 Brussels Mint
7946 Brussels
7952 Butter Chessmen
8908 Tahiti
9042 Chocolate Chessman

**PF Chocolate Chunk – Crispy**
7522 Tahoe
7708 Chesapeake

**Single Serve Goldfish**
7574 Cinnamon GF Grahams,SS (Each Pouch)
7760 Cheddar Cheese GF, SS (Each Pouch)
7867 Cheddar Cheese Goldfish 2 oz.
8127 Goldfish Colors Carton 2 oz.
8799 Cheddar GF 2.5oz Grab Bag
8800 GF Colors 2.25oz Grab Bag
8801 FB Cheddar 2.25oz Grab Bag
9000 Variety Pack (Cheddar GF/ Pretzel GF/ Minin Nantucket 9ct)
9001 Goldfish Colors 9ct. Multipack (1.1oz Pouch)
9002 Flavor Blasted Xtra Cheddar - 9ct
9003 Cheddar Cheese GF, SS 9ct-1.25 oz
9133 12ct Whole Grain Cheddar GF Multi-pack
9137 9ct Whole Grain Cheddar GF Multi-pack

**Baked Naturals**
8932 Wheat Crisps - Zesty Tomato Herb
8934 Wheat Crisps - Toasted Wheat
8942 Pretzel Thins - Simply Pretzel
8943 Snack Sticks - Artisan Cheese
8947 Snack Sticks - Toasted Sesame
8948 Pretzel Thins - Savory Cheddar
9215 Baked Naturals Pre-packed Shipper

**Snack Sticks**
7802 Pumpernickel
7803 Sesame
7805 Three Cheese

**Distinctive Crackers**
7144 Holiday Quartet DC Shipper (24 CT)
7447 Quartet Cracker Asst.
7477 Golden Butter
7487 Hearty Wheat
8985 Classic Water

**Bag Goldfish**
8089 Holiday - Red & Green Goldfish
8539 Goldfish Colors
8546 Parmesan Cheese
8547 Cheddar Cheese
8550 Original
8554 Low Salt Cheddar
8560 Pizza
8561 Baby Cheddar
8562 Pretzel

7712 Sausalito
7713 Nantucket
7860 Double Chocolate Nantucket
9193 Crispy Chocolate Chunk - White & Milk Chocolate
**PF Chocolate Chunk - Soft Baked**
7821 SB Chocolate Chunk -- Nantucket
7869 SB Choc Macadamia -- Sausalito
7884 SB Oatmeal Raisin - Santa Cruz
8203 SB Dark Chocolate Brownie -- Captiva
8206 SB Caramel -- Carmel
8469 SB Sugar Cookie
8470 SB Snickerdoodle
8899 SB Oatmeal
8900 SB Milk Chocolate
8901 SB Molasses
9192 SB Chocolate Chunk - White & Milk Chocolate

**Fruit Cookies**
7462 Verona Apricot Raspberry
7464 Verona Strawberry
9058 Verona Apple Caramel
9059 Verona Blueberry
9109 Montieri Peach Tart
9110 Montieri Apple Cinnamon Tart
9111 Montieri Raspberry Tart
9177 Fruit Cookies Prepacked Shipper

**Old Fashioned/Homestyle**
7438 Sugar
7444 Shortbread
7445 Gingermen

**100 Calorie Pack Cookies**
8973 Butter Chessman 100 Calorie Pack
8975 Chocolate Chessman 100 Calorie Pack
8976  Chocolate Chunk 100 Calorie Pack

**Single Serve Cookies**
7515 Milano 2 Pk.
7619 Sausalito
7668 Brussels 2Pk.
7696 Nantucket
7796 Milano 3 Pk., (Each Pouch)
7875 Milano 3 Pk., 9ct Tray (comprised of 7796)
7877 CCC Minis,  9ct tray
8797 Mini Chessman Grab Bag
8798 Mini Nantucket Grab Bag
8854 Dark Chocolate Brownie 2-pack
8855 Soft Baked Oatmeal Raisin 2-pack
8884 Milano 3pk. Grab Bag

8563 Bilingual Cheddar
8564 Calcium
8578 Whole Grain Cheddar GF
8930 Starfish Cheddar
**Flavor Blasted Goldfish**
8548 Flavor Blasted Xtra Cheddar GF
8551 Flavor Blasted Jalapeno Queso GF
8552 Flavor Blasted Nothin' but Nacho GF
8553 Flavor Blasted Xplosive Pizza GF
8886 Flavor Blasted Blazin Buffalo GF

**Goldfish Box**
8172 Extra Cheddar Flavor Blasted Goldfish
8639 Goldfish Colors
8708 Cheddar GF

**Goldfish Box - 18 oz.**
7579 18 oz Cheddar Cheese

**Goldfish Variety Packs**
7523 Goldfish On The Go Cheddar (Pouch)
7615 Goldfish On The Go Cheddar
7639 Goldfish On The Go Variety Pk
7650 Goldfish On The Go Variety Pk (Pouch)

**100 Calorie Pack Goldfish**
8745 Baby Wholegrain Cinnamon 100 Calorie Pack
8748 Baby FB Wholegrain Cheddar 100 Calorie Pack
8749 Baby Wholegrain Cheddar 100 Calorie Pack
8763 Baby Wholegrain Chocolate 100 Calorie Pack
8869 Pretzel 100 Calorie Pack

**Goldfish Novelty Packs**
8392 0.4oz Cheddar GF Pouches
8534 0.4oz pouches FBGF Extra Cheddar

For distribution of the foregoing products to direct billing customers of Bakery under Paragraph 3 (b) of this Agreement, Consignee will, subject to the terms o that Paragraph 3 (b), to be paid a percentage of the net proceeds of such sales payable to Bakery calculated at the rate of  20% of the published prices in effect from time to time for Consigned Products

**A GUARANTY**

IN CONSIDERATION of the execution and delivery of that certain Consignment Agreement by and between **Warehouse Trainers Inc.** ("Distributor") and Pepperidge Farm, Incorporated ("Pepperidge Farm") dated **May 21, 2018** (the "Agreement"), and for other good and valuable consideration, the receipt of which is acknowledged, the undersigned Guarantor hereby represents, warrants and agrees as follows:

1.      Guarantor is, and at all-time hereafter shall remain, the owner, free and clear of all liens, security interests, and claims or rights of others, of a majority of all issued outstanding shares of each class of securities, common stock or otherwise, of the Distributor, including, without limitation, its voting securities (such securities owned by Guarantor being hereafter referred to as the "Securities").

2.      Guarantor shall not sell, assign, pledge, encumber or otherwise transfer all or any portion of the Securities to any person, firm, corporation or other entity without the prior written consent of Pepperidge Farm.

3.      Guarantor shall, and hereby does, guaranty the full, complete and timely performance by Distributor of each and every obligation of Distributor under the foregoing Agreement (each, an "Obligation").

4.      Guarantor waives: (a) notice of the acceptance by Pepperidge Farm, Incorporated, and its affiliates, successors and assigns (each, a "Beneficiary"); (b) notice of the existence or creation or non-payment or non-performance of all or any Obligations; (c) presentment, demand, notice of dishonor, protest and all other notices whatsoever; and (d) all diligence in collection or protection of or realization upon the Obligations or any thereof, any obligation hereunder, or any security for or guaranty of any of the foregoing. A Beneficiary may, from time to time, without notice to Guarantor, assign (collaterally or otherwise) or transfer any or all of the Obligations or any interest therein and each and every assignee or transferee of any of the Obligations shall be entitled to the benefits of this Guaranty.

5.      The obligations of Guarantor under this Guaranty shall be absolute, continuing and unconditional irrespective of any circumstance whatsoever which might constitute a legal or equitable discharge or defense of Guarantor, including, without limitation, (a) the genuineness, validity, regularity or enforceability of any of the Obligations; (b) any amendment, waiver or other modification of the Agreement; (c) the extension of the time for or waiver of, at any time or from time to time, without notice to the Guarantor, Distributor's performance of or compliance with any of its obligations under the Agreement; (d) any merger or consolidation of Distributor or the Guarantor into or with any other person; (e) any change in the ownership of any shares of capital stock of Distributor; (f) the liquidation, dissolution, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition or readjustment of, or other similar proceedings affecting the status, existence, assets or obligations of, Distributor, or the disaffirmance with respect to Distributor of the Agreement in any such proceeding, or (g) any other actions, occurrences or circumstances whatsoever. This Guaranty is an absolute, present and continuing guaranty of payment and performance and not of collectability and is in no way conditional or contingent upon any attempt to collect from Distributor any unpaid amounts due or otherwise to enforce performance by Distributor.

IN WITNESS WHEREOF, the Guarantor has executed this Guaranty as of **May 21, 2018**

**WAREHOUSE TRAINERS INC.**



_____
**Daniel Kletcheck**

# <u>EXHIBIT C</u>

**DEFINITIONS**

(a)    BAKERY – refers to PEPPERIDGE FARM, INCORPORATED, the grantor of the Distributorship, a Connecticut corporation having its principal office in Norwalk, Connecticut.

(b)    CONSIGNEE – refers to the grantee of this Distributorship identified on the cover page hereof.

(c)    TERRITORY – refers to the territory described in Schedule A hereto.

(d)    CONSIGNED PRODUCTS – refers to those products listed in Schedule B hereto (subject to modification per Paragraph 10) but only when packaged or wrapped in retail packaging under the brand name "Pepperidge Farm" and sold or intended to be sold to retail stores as fresh (i.e. not preserved or stale), first quality (i.e. not Seconds) merchandise and does not include (1) any of such products sold, or intended to be sold to retail stores, frozen, refrigerated, canned, or otherwise preserved, (2) any of such products sold, or intended to be sold, to retail stores in a raw or uncooked state, (3) any of such products sold, or intended to be sold, to retail stores in bulk for resale by such retail stores at an in-store bakery or at a food-service counter or food-service section located within such retail store, (4) Stale Products, (5) Seconds, (6) merchandise of others containing Consigned Products as components, (7) any of such products packaged or wrapped in food-service or other non-retail packaging or (8) any of such products packaged, wrapped or sold under any brand name other than "Pepperidge Farm."

(e)    STALE PRODUCTS – refers to Consigned Products whose shelf life has expired, as determined by Bakery's stale policy existing from time to time.

(f)    SECONDS – refers to Consigned Products which do not meet the high standards required by Bakery for distribution in the ordinary manner and thus are deemed by Bakery, in its sole discretion, to be unsuitable for that purpose.

(g)    DISTRIBUTION OR DISTRIBUTE – refers to the sale and delivery of Consigned Products to retail stores within the Territory and to such hotels, restaurants, etc., as may be authorized by Bakery per Paragraph 9.

(h)    BULLETIN PRICES – refers to the prices for Consigned Products charged by Bakery and published from time to time.

(i)    CHAIN – refers to any person, firm, corporation or other legal entity that owns or operates three or more retail stores.

(j)    DISTRIBUTORSHIP – refers to the distribution rights described in, and established under, this Agreement.

**TERMS**

1.    EXCLUSIVENESS OF DISTRIBUTORSHIP.  Consignee will have the exclusive right to distribute Consigned Products to retail stores within the Territory, and Bakery will not sell or deliver or authorize any others to sell or deliver Consigned Products to retail stores (except for the in-store bakeries, food-service counters and food-service sections located in retail stores) within the Territory except in connection with temporary sales programs and except for sales to direct customers pursuant to orders solicited by Consignee under Paragraph 3 (b); provided, however, that Bakery will have the exclusive right to distribute Consigned Products to retail facilities owned or operated by Bakery or by any corporation controlled by Bakery.  The terms of this Paragraph are subject, however, to the terms of Paragraphs 6, 7, and 9.

2.    QUANTITIES CONSIGNED.  Bakery will consign and deliver to Consignee at such locations as shall, from time to time, be designated by Bakery, and Consignee will accept sufficient quantities of Consigned Products to maintain at all times an adequate and fresh supply thereof in all retail stores in the Territory which request such products and whose accounts are not demonstrably unprofitable; provided, however, Bakery reserves the right to allocate its products as nearly proportionately as practicable if the overall demand for its products exceeds its production.  Consignee shall hold and care for all Consigned Products as the sole and exclusive property of Bakery.  Title to all Consigned Products shall be vested in, subject to, and under the control of Bakery until delivered by Consignee to a purchaser.  Consignee shall not encumber or grant any security interest in or lien on, or by action or inaction cause or allow any encumbrance, security interest or lien to be imposed upon, the Consigned Products.

3.    PROCEEDS AND RECORDS OF SALE.

(a)    Except as provided in subparagraph (b), Consigned Products shall be consigned to Consignee at Bulletin Prices, less the percentage specified in Schedule B, for sale and delivery to retail stores at such prices as Consignee may determine.

(b)    Bakery may bill directly any Chains and military commissaries that have requested such direct billing or that request it in the future.  Such directly billed stores in the Territory will be direct customers of Bakery, and Consignee will solicit sales from them and receive product for delivery to them on Bakery's behalf at Bulletin Prices.  Bakery assumes all credit risks with respect to Chains and military commissaries which receive such direct billing.  The funds owed by such Chains and military commissaries as a result of the Consigned Products delivered

are accounts receivable of, and debts payable to, Bakery and are not the property of Consignee. Consignee shall have the exclusive right to perform the service of delivery of Consigned Products to such customers of Bakery and Bakery shall not effect such delivery except through Consignee, subject to the provisions of Paragraphs 1, 6, 7, and 9. For the performance of his/her services of solicitation and delivery under this subparagraph (b), Consignee, if he/she shall have made prompt and timely delivery of all charge tickets as required by subparagraph (d) (2), shall be paid a percentage of net proceeds payable to Bakery by the direct billing customers, such percentage to be calculated at the rate specified in Schedule B.

(c)     Bakery may from time to time extend credit to Consignee for Consigned Products to be sold to retail stores on credit extended by Consignee; provided Bakery has approved in advance the stores to receive such credit and the amount and terms thereof. Notwithstanding the foregoing, any credit extended by Consignee shall be at Consignee's risk.

(d)     (1)  Consignee shall pay promptly each week on the day specified by Bakery for all Consigned Products sold and delivered by Consignee during the preceding week, less any amounts which would be otherwise due on such sales as to which Bakery shall have extended credit to Consignee under (c) above, plus any amounts becoming due during such week under the terms of credit extended during any previous week.

(2)  Consignee shall promptly deliver to Bakery on such days as Bakery may specify all charge tickets for all deliveries of Consigned Products to direct customers of Bakery for direct billing by Bakery.

(e)     Consignee will keep such records of Consigned Products received and sales and deliveries made as Bakery may from time to time reasonably request; Bakery may inspect such records and Consigned Products at such times as Bakery may select. Without limiting the generality of the foregoing, Consignee agrees that Bakery may take physical inventory of Consigned Products in Consignee's possession whenever and as often as Bakery deems advisable and that Consignee will keep such records of his/her operation and will furnish Bakery such copies thereof as Bakery may reasonably require.

4.     DISTRIBUTION EFFORTS. Consignee will use his/her best efforts to realize the full sales potential of the Territory for Consigned Products. To this end, Consignee will (a) actively solicit all retail stores in the Territory whose accounts can by profitably handled, (b) maintain at all times an adequate and fresh supply of Consigned Products in all such retail stores, (c) provide distribution service to all such retail stores on such days of the week (including weekends), at such intervals and with such frequency as is necessary to realize the full sales potential thereof and to maintain an adequate and fresh supply of Consigned Products therein, (d) make available to all such retail stores all varieties of authorized Consigned Products unless it is demonstrably unprofitable to do so, (e) cooperate with Bakery in the effective utilization of Bakery's advertising, sales promotion and space merchandising programs and (f) keep fully informed of Bakery's recommended policies and methods for increasing sales and improving distribution service. Consignee may sell or distribute other products, not competitive with Consigned Products, so long as such sale or distribution does not otherwise violate any terms or conditions of this Agreement or interfere with Consignee's performance of his/her obligations under the terms of this Agreement. Bakery may, from time to time, establish reasonable sales and/or distribution goals for Consignee and this Distributorship, and Consignee shall either meet or exceed such goals.

5.     DISTRIBUTION SERVICE AND FACILITIES. Consignee will maintain efficient distribution service throughout the Territory in keeping with the established reputation of Bakery and the high quality of its products. To this end, Consignee will (a) provide adequate equipment and, if not otherwise provided by Bakery, facilities for the receipt, handling and delivery of Consigned Products and the accounting, inventory and billing thereof, including, without limitation, such computer and/or other systems as may be necessary or appropriate therefor, (b) comply with all laws and regulations relating either directly or indirectly to the operation or ownership of the Distributorship, including, without limitation, all  motor vehicle, food, drug, health and sanitary laws and regulations and (c) maintain such route books and other records as are required by Bakery from time to time. Pursuant to the foregoing, Consignee shall provide, and shall maintain in good and proper working condition and appearance, a delivery truck, computer and such other equipment as, from time to time, shall be necessary for the operation of the Distributorship. Consignee shall maintain the general appearance and condition of such truck, computer and other equipment, as well as Consignee's appearance and deportment and that of his/her helper or helpers, if any, in accordance with the established reputation of Bakery and the high quality of its products.

6.     EMERGENCY SERVICE. If, by reason of illness or vacation or any other cause, Consignee shall be unable at any time to provide or maintain the efficient distribution service contemplated by this Agreement, Consignee will make other suitable arrangements at his/her own expense for the provision and/or maintenance of such service; but if Consignee is unable or fails to do so, Bakery is authorized in its discretion to provide and/or maintain such service as Consignee's agent and at Consignee's expense and risk. Upon the request of Consignee, Bakery will endeavor in any emergency to provide and/or maintain such service as Consignee's agent and at Consignee's expense and risk.

7.     FAILURE TO SERVICE PARTICULAR STORES. If Consignee fails for any reason to provide or maintain satisfactory distribution service to  any segment of the Territory or to any retail store within the Territory,

and such failure is not remedied within five days after written notice thereof from Bakery, Bakery, in addition to the other remedies available to it hereunder, may make other arrangements, on either a permanent or temporary basis, in the discretion of Bakery, for the service of such store or segment of the Territory, as the case may be. If such arrangements for service are made on a permanent basis, the retail store or segment of the Territory involved shall be deemed to be no longer included in the Territory and Schedule A shall be modified accordingly, all without compensation or remuneration to Consignee.

8.    CHAIN STORE ACCOUNTS. If any Chain requires that authorization for the distribution of Consigned Products to the Chain's retail stores in the Territory shall be obtained through a central or district office located outside of the Territory, or only in conjunction with the distribution of Consigned Products to its retail stores in other territories, Bakery will cooperate with Consignee in procuring such authorization. If any Chain refuses to pay or to permit store managers to pay any Consignee directly for Consigned Products and, instead, requires the submission of a consolidated bill to a central or district office of the Chain, Bakery will handle the billing, and the terms of Paragraph 3 (b) shall apply.

9.    PROHIBITED SALES AND DELIVERIES. Consignee will not sell or deliver any Consigned Products, or any products listed in Schedule B, directly to consumers or to any other purchasers except retail stores (exclusive of the in-store bakeries, food-service counters and food-service sections located in such retail stores) within the Territory and such hotels, restaurants, clubs and similar organizations within the Territory as Bakery may authorize in writing. Also, Consignee will not, without like authorization, make deliveries of Consigned Products to any Chain via a central or district warehouse or in any manner other than directly to its retail stores. If, despite the best efforts of Consignee and Bakery to obtain permission from any Chain to make deliveries directly to its retail stores, such Chain refuses to handle Consigned Products except via warehouse deliveries, Bakery shall have the right in its discretion to sell and deliver the Consigned Products directly to such Chain for its own account via such warehouse deliveries, as long as such refusal remains in effect. In addition, Consignee shall, if requested to do so in writing by Bakery, on a non-exclusive basis and for the period of time set forth in such written request, distribute products listed in Schedule B (as modified from time to time pursuant to Paragraph 10) to in-store bakeries and to food-service counters and food-service sections located in retail stores in the Territory.

10.    MODIFICATION OF LIST PRODUCTS. The list of Consigned Products set forth in Schedule B hereto may be modified or changed by Bakery from time to time by (a) adding such other products as it may deem advisable among those which it now or hereafter produces, (b) withdrawing within any sales district or other geographic area any Consigned Products (whether originally listed or subsequently added) which it discontinues producing or which it discontinues selling in such sales district or other geographic area or (c) adding or withdrawing at any time with or without notice and for any reason any product designated as "test product," "for market test" or the like. In addition, Bakery shall have the right from time to time to change the ingredients, the method of production or the labeling or packaging of any Consigned Products. In addition, if Consignee fails to comply with the terms and conditions of this Agreement with respect to any Consigned Product or Consigned Products, then Bakery may, in addition to any other remedies available to it hereunder, if such failure shall continue for a period of thirty days after written notice thereof from Bakery, without compensation or remuneration to Consignee, delete such Consigned Product or Consigned Products from Schedule B, in which event Consignee's right to distribute such deleted Consigned Products under the terms of this Agreement shall immediately terminate.

11.    SALES DATA. Consignee will furnish to Bakery such sales data as it may reasonably require for the planning of its production schedules, the expansion of its operations and the planning and conduct of sales promotion programs.

12.    TRADE NAME, ETC. Consignee may use Bakery's trade name, trademark and distinguishing colors on his/her truck and other equipment and supplies; provided, however, that (a) Bakery's trade name may not be used as a part of any business name or trade name of Consignee without the written consent of Bakery or in any other way which will tend to confuse the separate identities of Bakery and Consignee, and (b) Bakery shall have the right at any time to revoke the permission granted in this Paragraph if, in its opinion, the general appearance of Consignee's truck or other equipment or his/her own general appearance or deportment or that of his/her helper or helpers, if any, shall fall below standards in keeping with the established reputation of Bakery and the high quality of its products.

13.    INSURANCE AND INDEMNIFICATION. Consignee shall, at Consignee's expense, maintain adequate public liability, property damage and, where appropriate, workers' compensation insurance to protect Bakery and Consignee against any and all claims of personal injury, death or property damage, other than damage to Consigned Products in possession of Consignee. Such insurance shall be in such amounts and have such limits as shall be acceptable to Bakery or required by the retail stores in the territory, whichever is greater, shall name Bakery as an additional insured thereunder and shall provide that the insurance may not be terminated without at least fifteen (15) days' prior written notice to Bakery. Consignee shall, prior to the date of execution of this Agreement, and at least annually thereafter, provide Bakery with insurance certificates evidencing such coverage. If Consignee fails to obtain or to maintain the insurance coverage required by this Paragraph, Bakery may, at its option, purchase such insurance coverage on behalf of Consignee, and Consignee shall reimburse Bakery in full for the cost thereof.

Consignee covenants and agrees to indemnify, defend and save Bakery harmless from and against any and all claims relating to payroll, unemployment compensation, employee benefits, personal injury, death, or property damage (other than damage to Consigned Products in the possession of Consignee) caused or alleged to have been caused directly or indirectly by or as a result of the actions of Consignee or his/her helper or helpers, if any, or by or as a result of the operation of the Distributorship or any vehicle or equipment owned or used by Consignee or his/her helper or helpers, if any, and any and all losses, damages, liabilities and expenses (including attorney's fees) incurred by Bakery as a result thereof. Anything in this Agreement to the contrary notwithstanding, this indemnification provision shall survive any termination of this Agreement.

14.   NON-PERFORMANCE FOR REASONS BEYOND CONTROL.  Neither Bakery nor Consignee shall be liable for any failure to comply with the terms of this Agreement if such failure shall have been caused primarily by fire, labor dispute, strike, war, insurrection, governmental restriction or any other cause beyond the control of the party so failing.

15.   INDEPENDENT BUSINESSMAN.  Consignee is a self-employed independent businessman, not an agent or employee of Bakery, and has no authority other than to distribute products consigned hereunder and to solicit orders for and make deliveries of Consigned Products in the case of direct sales of Bakery under Paragraph 3 (b), express or implied, to do or perform any act or thing or to make any warranty or representation or promise or commitment of any character which will be binding upon Bakery or for which it will be responsible, and Consignee will refrain from any conduct inconsistent with the terms of this Paragraph 15.  Consignee may, at Consignee's own expense and risk, employee such persons as Consignee shall deem appropriate to assist in the performance of Consignee's obligations under this Agreement; and Consignee shall be responsible for the hiring, firing, training and supervision of, and all remuneration and benefits for, any person so employed.  The independent contractor relationship between Bakery and Consignee is an essential element of this Agreement.  The discount percentage and commission rates described in Paragraph 3 and the percentages established in Schedule B or any similar schedule under this Agreement are based in substantial part on such independent contractor relationship and the understanding that the Bakery is not obligated to pay any FICA, income or similar tax or withholding for or on behalf of the Consignee.

16.   LIEN OF BAKERY ON DISTRIBUTORSHIP.  Bakery shall have a first lien on the Distributorship and all proceeds of the Distributorship as security for all indebtedness of Consignee to Bakery at any time outstanding.  Any sale, transfer or assignment of the Distributorship (invalid per Paragraph 18 without the written approval of Bakery) shall be subject to such lien unless such lien shall be expressly released by Bakery in writing.  Consignee shall not, without the prior written consent of Bakery, encumber or grant any security interest in or lien upon, or by his/her action or inaction cause or allow any encumbrance, security interest or lien to be imposed upon the Distributorship, other than the lien imposed by this Paragraph 16; and it is expressly agreed that Bakery shall have no obligation whatsoever to consent to any such encumbrance, security interest or lien unless and until the proposed lienholder shall have agreed in writing to subordinate its lien, encumbrance or security interest to the lien created by this Paragraph 16.  Bakery's consent to any such encumbrance, security interest or lien which has been so subordinated to the lien of Bakery established pursuant to this Paragraph 16 shall not be unreasonably withheld.

17.   RIGHT OF FIRST REFUSAL.  Consignee must give Bakery written notice of each proposed sale, conveyance or transfer (hereinafter "proposed sale") of all or any portion of the Distributorship, which notice shall identify the prospective purchaser and the terms and conditions of the proposed sale.  Such notice of proposed sale from Consignee shall be deemed to be an irrevocable offer to sell the Distributorship, or the portion thereof described in such notice of proposed sale, to Bakery on the terms and conditions set forth therein.  Bakery shall have the right, but not the obligation, to accept such offer by giving Consignee written notice of acceptance within thirty days of the later of (i) Bakery's receipt of Consignee's written notice of proposed sale, or (ii) Bakery's receipt of the full and complete application of the prospective purchaser, including all requested financial and credit information (which right is hereinafter referred to as the "Right of First Refusal").  Such notice of acceptance from Bakery shall be deemed to be an acceptance of Consignee's offer of sale, and the sale of the Distributorship, or the portion thereof offered for sale, by Consignee to Bakery, on the terms set forth in the notice of proposed sale, shall be consummated at a closing to be held within thirty days of such notice of acceptance.  Bakery's failure or refusal to exercise any Right of First Refusal hereunder does not constitute, and shall not be deemed to be, an approval by Bakery of the proposed sale or the proposed purchaser.  Any change in the identity of the proposed purchaser or in any terms of any proposed sale from those identified in any notice from Consignee to Bakery hereunder shall be deemed to be a new proposed sale with respect to which Consignee must give Bakery a new notice and a new Right of First Refusal in accordance with the terms of this Paragraph 17.

18.   SALE OF DISTRIBUTORSHIP.  The Distributorship may not be sold, conveyed or transferred by Consignee in whole or in part without the prior written approval of Bakery.  Bakery will grant such approval with respect to a proposed sale if (i) Consignee has given Bakery proper and timely notice of such proposed sale as required by Paragraph 17, (ii) Bakery has not exercised, or has in writing refused to exercise, its Right of First Refusal with respect to such proposed sale and (iii) the purchaser meets the requirements of Bakery as to character,

ability, financial responsibility, business acumen adequate facilities and involvement in the business, provided, however, that any such approval shall be conditioned upon Consignee's payment in full, prior to such sale, of all Consignee's indebtedness to Bakery.  In addition, where such proposed sale involves the division of the Territory or the sale of only a portion of the Distributorship, such proposed sale is subject to, and may not be effected without, Bakery's prior written approval of the division of Territory sought to be effected thereby.  Bakery will notify Consignee with reasonable promptness of its approval or disapproval of any proposed sale and, if applicable, of any proposed division of the Territory.  Any transaction or instrument which purports to constitute an assignment of this Agreement or a sale, transfer or assignment of the Distributorship, as a whole or in part, without such written approval shall be void.  Any transaction or instrument which purports to constitute an assignment of this Agreement or a sale, transfer or assignment of this Distributorship, as a whole or in part, on terms that are different from those set forth in, or to a party different from the proposed purchaser identified in, the notice of proposed sale given Bakery pursuant to the terms of Paragraph 17 shall be void.  Any valid sale of this Distributorship as a whole shall operate to release Consignee from all obligations to Bakery hereunder except the obligation to pay in full any adverse balance in his/her account with Bakery, and Bakery shall have the right in its discretion to require the purchaser to accept a new consignment agreement in substantially the same form, in lieu of continuing this Agreement in effect, in whole or in part, on an assigned basis.

19.    TERMINATION OF CONSIGNMENT AGREEMENT FOR CAUSE.  Bakery, in addition to all other remedies available to it at law or equity and to the extent permitted by law, shall have the right in its discretion to terminate this Agreement at any time, upon written notice to Consignee, for any of the following causes:

(a)    failure of Consignee adequately to realize the sales potential of the Territory and Consignee's failure to make satisfactory improvement within thirty days after notice of inadequacy from Bakery;

(b)    failure of Consignee to perform or comply with any material term or provision of this Agreement and the continuance of such failure for seven (7) days after written notice thereof from Bakery;

(c)    failure of Consignee to maintain the general appearance and condition of his/her truck or other equipment or his/her own general appearance or deportment or that of his/her helper or helpers, if any, in accordance with standards in keeping with the established reputation of Bakery and the high quality of its products and the continuance of such failure for more than five days after written notice thereof from Bakery;

(d)    any repeated failure of the type described in any of subparagraphs (a) through (c) above, even though a previous failure or failures may have been corrected after notice;

(e)    any dishonesty of Consignee in his/her dealings with Bakery or with others in connection with Consignee's distribution services under this Agreement;

(f)    any actions, activities or practices of Consignee which either do, or in the opinion of Bakery are likely to, materially damage the reputation of Bakery and/or Bakery's relations or reputation with consumers, retail stores or any other purchaser of Consigned Products;

(g)    Consignee's insolvency or admission in writing of his/her inability to pay his/her debts as they mature;

(h)    the filing of voluntary bankruptcy petition by Consignee or his/her failure to vacate an involuntary bankruptcy petition within sixty days after date of filing;

(i)    failure of Consignee to vacate the appointment of a receiver or trustee of Consignee's business or assets within sixty days after the date of appointment; or

(j)    a general assignment by Consignee for the benefit of his/her creditors.

Termination of this Agreement and the Distributorship pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except Consignee's right to receive compensation therefor in accordance with the established business practices of Bakery, and each party's right to receive any favorable balances and obligation to pay any adverse balances.

20.    BAKERY'S OPTION TO BUY DISTRIBUTORSHIP.  Bakery shall have the right in its discretion to purchase all or any portion of the Distributorship at any time upon written notice to Consignee.  Bakery shall become the owner of the Distributorship, or the portion being purchased, on the date specified in the notice, whether or not a final purchase price has been agreed upon or determined, as provided below.  Bakery may begin operating the Distributorship, or the portion being purchased, for its own account on such date.  If Bakery elects to purchase all or any portion of the Distributorship pursuant to this Paragraph, it will pay to Consignee a sum equal to (a) the fair market value of the Distributorship, or the portion thereof being purchased, as the case may be, on the date set forth in the written notice plus (b) 25% of such fair market value, to be determined either by agreement between Bakery and Consignee or, if they shall be unable to agree, by three arbitrators, one of whom shall be chosen by Bakery and one by Consignee and the third by the two first chosen.  Each party to such arbitration shall pay all fees and expenses incurred by it in connection with such arbitration, including, without limitation, the fees and expenses of the arbitrator chosen by it; and the fees and expenses of the third arbitrator shall be shared equally by Consignee and Bakery.  The determination of fair market value by a majority of the three arbitrators shall be final and binding upon both Bakery and Consignee for the purpose of this Paragraph.  Notice of purchase pursuant to this Paragraph shall

operate to release all rights and obligations hereunder of both Bakery and Consignee except (a) the right to receive any favorable balances and the obligation to pay any adverse balances and (b) the rights and obligations with respect to payment and arbitration stated in this Paragraph.

21.   TERMINATION OF CONSIGNMENT AGREEMENT BY CONSIGNEE.  Consignee shall have the right in his/her discretion to terminate this Agreement at any time upon thirty days written notice to Bakery.  Termination pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except the right to receive any favorable balances and the obligation to pay any adverse balances.

22.   DEATH OF CONSIGNEE.  In case of Consignee's death, all terms of this Agreement (see particularly Paragraph 6) shall continue in effect during the next ninety days, and shall inure to the benefit of and be binding upon the legal representatives of Consignee's estate during such period.  If the legal representatives of Consignee's estate shall not have sold the Distributorship pursuant to Paragraph 18 within such ninety day period, all rights and obligations hereunder of both Bakery and Consignee's estate shall terminate at the expiration of such period except (a) the right to receive any favorable balances and the obligation to pay any adverse balances and (b) the right of Consignee's estate to receive and the obligation of Bakery to pay to Consignee's estate the entire proceeds (subject, however to Bakery's lien per Paragraph 16) of any sale of the Distributorship (in whole or in part) made or contracted to be made by Bakery within the next ninety days; provided, however, that if Bakery shall have provided distribution services within all or any portion of the Territory during all or any portion of the period from the expiration of the first ninety day period to the date of such sale, Bakery may deduct from the proceeds of sale any excess of its expense over income in providing such services.  If Bakery provides emergency distribution services under Paragraph 6 during all or any portion of the first ninety day period, any excess of its income over expense in providing such service shall be paid to Consignee's estate (subject to any right of set-off that may exist), but Consignee's estate shall not be liable to Bakery for any excess of its expense over income in providing such services, although any such excess may be deducted from the proceeds of sale.

23.   TERMINATION OF CONSIGNMENT AGREEMENT WITHOUT CAUSE.  Bakery shall have the right in its discretion to terminate this Agreement at any time without cause upon written notice to the Consignee.  Upon termination pursuant to this Paragraph the Bakery will pay to the Consignee a sum equal to (a) the fair market value of the Distributorship on the termination date plus (b) 25% of such fair market value, to be determined either by agreement between Bakery and Consignee or, if they shall be unable to agree, by three arbitrators, one of whom shall be chosen by Bakery and one by Consignee and the third by the two first chosen.  Each party to such arbitration shall pay all fees and expenses incurred by it in connection with such arbitration, including, without limitation, the fees and expenses of the arbitrator chosen by it; and the fees and expenses of the third arbitrator shall be shared equally by Consignee and Bakery.  The determination of fair market value by a majority of the three arbitrators shall be final and binding upon both Bakery and Consignee for the purpose of this Paragraph.  Termination pursuant to this Paragraph shall operate to release all rights and obligations hereunder of both Bakery and Consignee except (i) the right to receive any favorable balances and the obligation to pay any adverse balances and (ii) the rights and obligations with respect to payment and arbitration stated in this Paragraph.  This Paragraph, and the rights and remedies set forth in this Paragraph, shall constitute the Consignee's sole remedy in the event of a termination of this Agreement without cause.

24.   WITHHOLDING PRODUCT.  Upon Consignee's failure to fulfill any of his or her obligations under this Agreement or upon the occurrence of any of the events referred to in Paragraph 19, Bakery shall have the right, without thereby terminating this Agreement, immediately to discontinue shipment of Consigned Products to Consignee until such time as Consignee shall have completely remedied such failure or occurrence, and no such discontinuance shall be, or be deemed to be, a waiver by Bakery of any of its rights or remedies under this Agreement or at law or in equity, including without limitation, the right to terminate this Agreement for the same failure or occurrence.  Bakery's rights and remedies under this Paragraph shall be in addition to, and may be exercised concurrently with, all other remedies available to it under this Agreement or at law or in equity.

25.   NOTICES.  All notices which are required to or which may be given under the terms hereof shall be in writing and shall be deemed given when deposited in the United States mails, postage prepaid, and addressed to the other party at the address designated for such party on the cover page hereof.  Either party may change such address by giving notice of a new address.

26.   DURATION OF CONSIGNMENT AGREEMENT.  This Agreement shall continue in effect until terminated in the manner provided in Paragraphs 19, 21, 22 or 23, until Bakery has given Consignee written notice of Bakery's election to purchase all or any portion of the Distributorship, as provided in Paragraph 20, or until Bakery has purchased all or any portion of the Distributorship pursuant to the Right of First Refusal, as provided in Paragraph 17.  In the event that Bakery has given Consignee written notice of its election to purchase a portion of the Distributorship as provided in Paragraph 20 or if Bakery has purchased a portion of the Distributorship pursuant to the Right of First Refusal as provided in Paragraph 17, the parties shall promptly enter into a new Consignment Agreement in substantially the form hereof, except for the modification of the Description of Territory in Schedule A to reflect such purchase.

27.    GENERAL.  The terms of this Agreement shall be construed so as to carry into effect its true intent and meaning, and any ambiguities shall be construed and any inconsistencies shall be reconciled accordingly.  Any consent, permission, authorization or waiver given hereunder with respect to any continuing act or condition may be subsequently revoked in the same manner as given.  Except as expressly set forth herein, this Agreement may not be assigned by Consignee.

28.    ENTIRETY OF CONSIGNMENT AGREEMENT.  This Agreement represents the entire agreement between Bakery and Consignee and supersedes any and all prior franchises, agreements or understandings between Bakery and Consignee, whether written or oral, regarding distribution of Consigned Products.  This Agreement may not be amended orally or by custom or conduct but only by a writing signed by both Bakery and Consignee.

This Consignment Agreement is
accepted upon the terms stated above.


**APPROVED:  OCTOBER 18, 2010**                    **APPROVED:  OCTOBER 18, 2010**

                                                   **PEPPERIDGE FARM, INCORPORATED**

**CHRISTOPHER M. WALKER**                           **BERNARD P. QUINLIVAN**
**CONSIGNEE**                                       **CUSTOMER VICE PRESIDENT**
                                                   **NORTHEAST REGION**