## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DOUGLAS M. CARPENTER, DANIEL KLETCHECK, and CHRISTOPHER M. WALKER,<br>*Plaintiffs, on behalf of themselves and all others similarly situated,*<br><br>v.<br><br>PEPPERIDGE FARM, INCORPORATED,<br>*Defendant.* | CIVIL ACTION<br>NO. 20-cv-3881-GJP |
| PEPPERIDGE FARM, INCORPORATED<br>*Counterclaimant,*<br><br>v.<br><br>DOUGLAS M. CARPENTER, DANIEL KLETCHECK, and CHRISTOPHER M. WALKER,<br>*Counterclaim Defendant.* | |
| PEPPERIDGE FARM, INCORPORATED,<br>*Third-Party Plaintiff,*<br><br>v.<br><br>WAREHOUSE TRAINERS, INC., and CARPENTER CORE, INC.,<br>*Third-Party Defendants.* | |

**PAPPERT, J.**                                                    **July 14, 2023**

### <u>MEMORANDUM</u>

Douglas Carpenter, Daniel Kletcheck and Christopher Walker work as

"independent direct-store-delivery partners" ("IDPs") for Pepperidge Farm, ordering

Pepperidge Farm products on consignment and delivering them to retail stores within

1

their territories.  They purchased their distribution territories on the open market and work pursuant to a Consignment Agreement that designates them as independent contractors.  IDPs are responsible for soliciting retail store business in their territory; maintaining "an adequate and fresh supply" of Pepperidge Farm products in the stores they serve; providing distribution services to their stores frequently enough to "realize the [stores'] full sales potential; offering all product varieties that they think will be profitable; cooperating with Pepperidge Farm's promotional programs; and keeping informed of Pepperidge Farm's recommendations for increasing sales.

IDPs determine their own schedule, operate without day-to-day oversight from Pepperidge Farm, and own their trucks and tools.  They also own their territories, can only be terminated for cause or through an above-market-value buyout, hire employees to perform the distribution work for them, and can work other jobs and distribute non-competing products within their territories.  Plaintiffs operate their businesses consistent with the understanding that they are independent contractors:  they take tax deductions for business expenses and received PPP loans during the pandemic.

Against this backdrop, Plaintiffs decided in 2020 that they should be classified as employees rather than independent contractors.  They brought this putative class action against Pepperidge Farm, claiming violations of Pennsylvania's Wage Payment and Collection Law, 43 P.S. § 260.1 *et seq.*, and unjust enrichment.  (Am. Compl., ECF 36.)  Pepperidge Farm counterclaimed on a theory of unjust enrichment.  (Ans. to Am. Compl. & Countercl., ECF 45.)  The Court granted Pepperidge Farm's motion for judgment on the pleadings with respect to Plaintiffs' unjust enrichment claim.  (ECF 52.)  Pepperidge Farm now moves for summary judgment on each Plaintiff's WPCL

claim, (ECF 78, 81 & 83), and Plaintiffs move for summary judgment on Pepperidge Farm's unjust enrichment claim.  (ECF 77).

After considering the parties' motions and all responses and replies thereto and holding oral argument, (ECF 106), the Court grants Pepperidge Farm's Motion for summary judgment.  The record's undisputed facts show as a matter of law that Plaintiffs are independent contractors not covered by the WPCL.  Judgment in Pepperidge Farm's favor on the WPCL claim moots Pepperidge Farm's unjust enrichment claim.

## I

Pepperidge Farm is a "bakery" that manufactures breads, cookies, and snack products, including Goldfish crackers and Milano cookies.  (Def.'s SUMF re: Kletcheck ¶ 1, ECF 81-2.)  IDPs distribute Pepperidge Farm's products to grocery, convenience and other retail stores.  IDPs purchase Pepperidge Farm "routes"—exclusive distribution rights within a geographic territory—on the open market and sign a "Consignment Agreement" with Pepperidge Farm.  (Def.'s SUMF re: Carpenter ¶¶ 8–9, 12; Def.'s SUMF re: Kletcheck ¶¶ 4, 8, 14; Def.'s SUMF re: Walker ¶¶ 4, 8, 14.)  In exchange for exclusive distribution rights, an IDP agrees to "use its best efforts to realize the full sales potential of the Territory for Consigned Products."  (Carpenter Consignment Agreement ¶ 4, ECF 80-3.)[1]  "To that end" the IDP agrees to

> (a) actively solicit all retail stores in the Territory whose accounts can be
> profitably handled, (b) maintain, at all times, an adequate and fresh supply

---

[1]     The record includes one Consignment Agreement—though not necessarily the version currently in effect—for each Plaintiff.  (Carpenter Consignment Agreement, ECF 80-3; Kletcheck Consignment Agreement, ECF 82-4; Walker Consignment Agreement, ECF 84-3.)  Because the contract language is generally consistent across the three agreements, the Court will cite to just one for the sake of efficiency, noting, where relevant, any differences in the other plaintiffs' Agreements.

of Consigned Products in all such retail stores, (c) provide distribution service to all such retail stores on such days of the week (including weekends), at such intervals and with such frequency as is necessary to realize the full sales potential thereof and to maintain an adequate and fresh supply of Consigned Products therein, (d) make available to all such retail stores all varieties of authorized Consigned Products unless it is demonstrably unprofitable to do so, (e) cooperate with Bakery in the effective utilization of Bakery's advertising, sales promotion and space merchandising programs and (f) keep fully informed of Bakery's recommended policies and methods for increasing sales and improving distribution service.

(*Id.*)

Carpenter purchased his first Pepperidge Farm route, through his business, Carpenter Core, in 2015 for $475,000.[2]  (Def.'s SUMF re: Carpenter ¶¶ 7–8, 15, ECF 78-2.)  In 2018, he sold the distribution rights for one of the club stores on his route to Pepperidge Farm for approximately $80,000, but continues to operate the remaining portion of the route.  (*Id.* at ¶¶ 51, 54.)  Carpenter acquired a second route, through the now-defunct DP Carpenter business, in 2018 for $155,000.  (Def.'s SUMF re: Carpenter ¶ 30.)  He currently operates both routes.

Kletcheck, through his company, Warehouse Trainers, Inc., became an IDP in 2009.  (Def.'s SUMF re: Kletcheck ¶¶ 7–8, 10, ECF 81-2.)  He purchased a route from one IDP for $171,080, plus one store from another IDP's route for $52,850.  (*Id.* ¶¶ 20–22; Kletcheck Dep. 98:7–18, ECF 82-2.)  He sold that combined route for $270,000 in 2018, (Def.'s SUMF re: Kletcheck ¶ 26), and purchased a route closer to his home for $309,500.  (Kletcheck Dep. 125:9–18.)

---

[2]     Carpenter, Kletcheck and Walker have worked with Pepperidge Farm since 2015, 2009 and 2006, respectively.  The class period is from 2018 to the present, but the parties blurred that line in discovery.

Walker bought his first Pepperidge Farm distributorship for approximately $144,000 in 2006.  (Def.'s SUMF re: Walker ¶¶ 12–14, ECF 83-2.)  Fifteen months later, he sold the route for $165,000 and bought a route closer to his home for $150,000.  (*Id.* at ¶ 26.)  In 2010, he again sold his route—this time for $210,000—and bought portions of two existing routes, for a total of $230,000.  (*Id.* at ¶¶ 34–35, 37–38.)  Most recently, in 2022, he sold that combined route for $400,000 and purchased a new route for $300,000.  (*Id.* at ¶¶ 44, 55, 59.)  All of Walker's routes were operated as sole proprietorships, except for his current route, which is owned by an LLC he formed.  (*Id.* at ¶ 58.)

## II

Summary judgment is warranted if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.  *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145 (3d Cir. 2004), *holding modified by Erdman v. Nationwide Ins. Co.*, 582 F.3d 500 (3d Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A fact is "material" if it may affect the outcome of the suit under the governing law.  *Id.*  A mere scintilla of evidence supporting the nonmoving party will not suffice for a court to deny summary judgment.  *Id.* at 252.  Rather, the

5

nonmovant must "set forth specific facts showing there is a genuine issue for trial." *Id.* at 256.  A court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009).  But it need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).  Nor may a court make credibility determinations or weigh the evidence.  *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016).

"'When a legal standard requires the balancing of multiple factors, . . . summary judgment may still be appropriate even if not all of the factors favor one party,' so long as the evidence 'so favors' the movant that 'no reasonable juror' could render a verdict against it." *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 215 (3d Cir. 2015) (quoting *In re Enterprise Rent-A-Car Wage & Hour Emp't Pracs. Litig.*, 683 F.3d 462, 471 (3d Cir. 2012)).

## III

Only employees may bring a claim under Pennsylvania's WPCL.  *See* 43 Pa. Stat. § 260.9a(a).  The WPCL does not define "employee."  "In interpreting the meaning of employee under the WPCL, Pennsylvania courts have looked to similar statutes such as the Pennsylvania Unemployment Compensation Act and the Pennsylvania Workers' Compensation Act."  *Id.*  And, although the employee/independent contractor analysis under the federal Fair Labor Standards Act "differs somewhat" from the WPCL analysis, FLSA cases are "informative" in this area—particularly with respect to

analyzing an alleged employer's right to control a plaintiff's work.  *See Estate of Accurso v. Infra-Red Servs., Inc.*, 805 Fed. App'x 95, 101 n.3 (3d Cir. 2020) (unpublished).

Pennsylvania courts apply a well established multi-factor test to determine whether a plaintiff is an employee or independent contractor, looking to "the control of the manner that work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; the skill required for performance; whether one employed is engaged in a distinct occupation or business; which party supplies the tools; whether payment is by time or by job; whether the work is part of the regular business of the employer; and the right to terminate the employment at any time." *Morin v. Brassington*, 871 A.2d 844, 850 (Pa. Super. Ct. 2005) (quoting *Lynch v. WCAB*, 554 A.2d 159, 160 (1989)).  The right-to-control factor is "paramount," although no single factor is dispositive.  *Jani-King*, 837 F.3d at 320. Whether a person is an employee or independent contractor is a question of law in Pennsylvania.  *Estate of Accurso*, 805 F. App'x at 101.

IV

The first factor considers Pepperidge Farm's right to control the manner in which Plaintiffs perform their work.  Pennsylvania courts distinguish control over the quality of a contractor's work product from day-to-day supervision of the time, place and manner of an employee's work.  "Every job, whether performed by an employee or by an independent contractor, has parameters and expectations.  'Control' . . . is not a matter of approving or directing the final work product so much as it is a matter of controlling the means of its accomplishment." *Osborne Assocs., Inc. v. Unemp. Comp. Bd. of Rev.*, 39 A.3d 443, 449 (Pa. Commw. Ct. 2012) (unemployment compensation

case).  "[I]t is the existence of the *right* to control that is significant, irrespective of whether the control is actually exercised."  *Univ. Am-Can, Ltd. v. W.C.A.B.*, 762 A.2d 328, 333 (Pa. 2000).  The Plaintiffs make several arguments as to why Pepperidge Farm has the right to control them.  None of the arguments, addressed in detail below, create an issue of fact for the jury on Pepperidge Farm's right to control the IDPs' work.

A

In *Estate of Accurso*, the Third Circuit found an employer-employee relationship where the employer controlled the employee's schedule by setting the employee's working hours and directing his movements, and fired him for failing to notify the employer of his vacation.  805 F. App'x at 101–02.  In contrast, in *C E Credits Online v. Unemployment Compensation Board of Review*, 946 A.2d 1162, 1169 (Pa. Commw. Ct. 2008), the Commonwealth Court found that workers' ability to set their own hours and work from any location evidenced an independent contractor relationship.

Pepperidge Farm does not control IDPs' hours or dictate which stores to visit and in which order to visit them on a given day.  *See* (Def.'s SUMF re: Carpenter ¶¶ 70–74; Def.'s SUMF re: Kletcheck ¶¶ 66, 68–74;[3] Def.'s SUMF re: Walker ¶¶ 72–76[4]).  The only

---

[3]     Plaintiffs quibble with paragraph 74, but the dispute is not genuine.  Paragraph 74 says that "Kletcheck testified that no one from Pepperidge Farm dictates to him the order in which he needs to visit his stores."  Plaintiff disputes this in part for failing to note that, in response to the question "no one from Pepperidge Farm dictated to you the stores that you need to hit on a particular day, correct?" Kletcheck testified that "I have been told in the past what stores I need to go to." (Pls.' SOUF re: Kletcheck ¶ 74, ECF 91-4.)  Which order to visit stores is different from which stores to visit on a particular day.  And as discussed below, the record evidence of the voicemails on which Kletcheck based his testimony shows that the instructions were *customer* demands, not demands from Pepperidge Farm.

[4]     Paragraph 73 states that "Walker testified that he 'decides the order of stores' he services." Plaintiffs dispute this "to the extent that Plaintiff Walker testified that 'we can adjust the schedule on our handhelds.'"  (Pls.' SOUF re: Walker ¶ 73, ECF 91-5.)  The statement Plaintiffs cite does not contradict Pepperidge Farm's statement of the fact.  The complete exchange at Walker's deposition was as follows:

constraint Pepperidge Farm places on their schedules is assigning them a day of the week to go to Pepperidge Farm's warehouse and pull the products they ordered from the load delivered from the production plant.[5]  (Pls.' CSOF ¶ 50, ECF 91-2; Walker Dep. 179:17–24, ECF 84-5; Carpenter Dep. 251:16–252:9, ECF 80-2; Kletcheck Dep. 45:3–16.)  The day IDPs have to break down the load is not flexible—the receiving area must be cleared before the next delivery.  (Walker Dep. 216:9–12.)  But the IDPs can choose to store their sorted product in a designated spot at the depot, which they can access throughout the week at their convenience, or to load it all onto their trucks at once.  (Def.'s SUMF re: Kletcheck ¶ 77; Kletcheck Dep. 45:19–24.)  This minimally intrusive logistical requirement does not cross the line into the realm of employer-like control.  *See Franze*, 826 F. App'x at 77.

IDPs do not need Pepperidge Farm's approval to take breaks, time away from work, or vacations.  (Def.'s SUMF re: Walker ¶ 74; Def.'s SUMF re: Carpenter ¶¶ 78–79; Def.'s SUMF re: Kletcheck ¶ 78.)  They are also not required to attend any meetings.  (Def.'s SUMF re: Carpenter ¶ 92; Def.'s SUMF re: Kletcheck ¶ 102; Def.'s SUMF re: Walker ¶ 94.)

---

Q. And are you the person who decides the order of stores in which you're going to visit?
A. We can—we can adjust the schedule on our handhelds.
Q. So is the answer to my question yes?
A. Oh, yes.  Yeah.  I'm sorry.

(Walker Dep. 116:24–117:7.)

[5]   The parties dispute whether, during the relevant period, Pepperidge Farm promulgated "frequency guidelines" that require IDPs to visit stores a certain number of times per week based on the value of sales there.  (Def.'s Resp. to Pls.' Consol. Counterstatement of Facts ¶ 42, 44, ECF 96; Northeast Biscuit/Snacking Standards, Ex. F, ECF 91–12.)  This dispute is not material to the right-to-control analysis because the frequency guidelines do not direct the order or timing of IDPs' movements on any given day.

Kletcheck[6] relies on three voicemails he received from Pepperidge Farm employee John Weikel, which he claims directed him to go to a specific store on a certain day.  In each voicemail—one from July 2019, one from November 2019, and one from October 2022—Weikel told Kletcheck that a store needed a display set up or dismantled within a specific timeframe.  (ECF 91-7, 91-8, 91-9.)  But Weikel merely passed along information or requests from customers, which does not count as control by Pepperidge Farm.  *See Franze v. Bimbo Foods Bakeries Distribution, LLC*, 2019 WL 2866168, at *7 (S.D.N.Y. July 2, 2019) ("Defendants were more akin to intermediaries between Plaintiffs and their clients rather than direct managers"), *aff'd sub nom. Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x 74 (2d Cir. 2020).  Even if the demands originated with Weikel himself, three voicemails over Kletcheck's fourteen-year tenure with Pepperidge Farm (or even over the five-year class period) are not extensive enough to evidence an employer-employee relationship.

## B

Pepperidge Farm does not control the way IDPs carry out their day-to-day operations and exercise their business judgment.  IDPs are responsible for ordering the product they deliver to stores each week.  (Def.'s SUMF re: Walker ¶ 98.)  They determine what varieties and quantities to order based on planograms, shelf space, their knowledge of customer preferences within the territory, promotions, and other factors influencing product movement.  *See* (Def.'s SUMF re: Walker ¶¶ 98–100; Carpenter Dep. 213:19–214:16.)  Inventory management is far from mathematical:

---

[6]     There is nothing in the record suggesting that Walker or Carpenter received similar communications from any Pepperidge Farm employee, nor that Kletcheck received other voicemails than the three produced.

IDPs may choose to take an aggressive approach to try to increase profits, and they bear the risk of losing money if too much product goes stale before it is sold. (Def.'s SUMF re: Carpenter ¶ 118; Def.'s SUMF re: Walker ¶ 99.) Although Pepperidge Farm procures shelf space from retail chains at the inter-corporate level, IDPs work directly with store managers to get additional shelf space or more prominent display locations. (Def.'s SUMF re: Walker ¶ 115; Def.'s SUMF re: Kletcheck ¶ 127.)

IDPs serve two types of retail stores: "chain" and "cash" stores. As Pepperidge Farm's counsel explained at oral argument, "[w]ith respect to chain accounts, . . . Pepperidge Farm sets the prices, [and] works with the chain at the corporate level to decide what promotions are going to be run." (Oral Arg. Tr. 11:14–20, ECF 110.) Pepperidge Farm also obtains display space for its products in the chain stores, although IDPs can negotiate with the store managers to secure additional space. (Pls.' CSOF ¶¶ 31–33; Def.'s SUMF re: Kletcheck ¶¶ 127–28.) But "cash stores"—generally "mom and pop" or convenience-type stores—work directly and exclusively with the IDPs at the individual store level. (Def.'s SUMF re: Kletcheck ¶¶ 113–18; Def.'s SUMF re: Walker ¶ 117; Def.'s SUMF re: Carpenter ¶ 82.) IDPs choose whether to add a cash store to their route or stop servicing an existing cash customer, without needing Pepperidge Farm's permission. (Def.'s SUMF re: Carpenter ¶ 82; Def.'s SUMF re: Walker ¶¶ 118–19; Def.'s SUMF re: Kletcheck ¶ 116.) Pepperidge Farm is not involved in procuring shelf space or deciding what products or quantities to deliver. (Carpenter Dep. 201:23–202:10, Def.'s SUMF re: Kletcheck ¶¶ 118–19.) IDPs set the prices they charge to cash stores and are paid directly by the cash stores. (Def.'s SUMF re: Walker ¶¶ 120–22; Def.'s SUMF re: Kletcheck ¶ 115; Def.'s SUMF re: Carpenter ¶¶ 84–85.) In

*Franze*, the Second Circuit found that an identical division of "bargaining power" between the bakery and distributors did not interfere with the distributors' high level of control of their own business operations. 826 F. App'x at 77–78. The same is true here.

IDPs choose whether to operate their routes themselves or to hire others to do the work. (Def.'s SUMF re: Kletcheck ¶¶ 83–91; Def.'s SUMF re: Carpenter ¶¶ 55–61; Def.'s SUMF re: Walker ¶¶ 78–85.) They do not need permission from Pepperidge Farm to do this and, unlike prospective IDPs, the "helpers" they hire are not vetted by Pepperidge Farm. (Def.'s SUMF re: Kletcheck ¶ 86; Def.'s SUMF re: Walker ¶ 83.) IDPs pay helpers directly on terms negotiated between the IDP and helper without input from Pepperidge Farm. (Def.'s SUMF re: Carpenter ¶¶ 58, 60–61; Def.'s SUMF re: Kletcheck ¶¶ 86, 89; Def.'s SUMF re: Walker ¶ 90.) This strongly indicates an independent contractor arrangement; employees generally cannot pay someone else to do their job. Moreover, IDPs are free to distribute other companies' non-competing products within their territories. (Carpenter Consignment Agreement ¶ 4); *see SkyHawke Techs. LLC v. Unemp. Comp. Bd. of Rev.*, 27 A.3d 1050, 1058 (Pa. Commw. Ct. 2011) (non-compete limited to "particular area of services" does not negate contractor's freedom to work for other entities). They can also work other jobs without notice to or permission from Pepperidge Farm. (Def.'s SUMF re: Kletcheck ¶¶ 92–95; Def.'s SUMF re: Walker ¶¶ 86–89.) This freedom to work for others cuts against the right to control. *See SkyHawke*, 27 A.3d at 1058.

## C

The undisputed evidence shows, at most, that Pepperidge Farm controls the IDPs' work product; not the time, place or manner of their work. Plaintiffs argue that

Pepperidge Farm controls the manner of their work at chain stores by requiring them to follow planograms—diagrams showing where to place products on retail shelves. The parties dispute Pepperidge Farm's level of input on the planograms.  Pepperidge Farm's corporate designee testified that the retailers supply the planograms, and Pepperidge Farm merely passes them along to the IDPs.  (Def.'s SUMF re: Carpenter ¶ 86; Jordan Dep. 146:18–25, ECF 82-6.)  The Plaintiffs, on the other hand, testified to their belief that Pepperidge Farm generates the planograms, or at least has substantial input.  (Kletcheck Dep. 53:9–19; Walker Dep. 58:12–59:8.)  But this disagreement is not material to the question of Pepperidge Farm's right to control IDPs' work because Pepperidge Farm uses the planograms to control the ultimate services rendered to retail stores—keeping adequate supply of a variety of Pepperidge Farm products on the shelves.  *See* (Carpenter Consignment Agreement ¶ 4(b)–(c).)  Planograms are not generated for cash stores, (Def.'s SUMF re: Carpenter ¶ 88; Def.'s SUMF re: Kletcheck ¶ 117), and IDPs still have control over ordering product and negotiating additional display opportunities.

The record also shows that IDPs can deviate from planograms with permission from store personnel.  Carpenter and Kletcheck each said they had at some point received a "five-day" breach letter from Pepperidge Farm which they believed—but could not recall with certainty—related to planogram noncompliance.[7]  (Carpenter Dep. 288:24–289:8; Kletcheck Dep. 31:25–33:8.)  But all three plaintiffs testified that they

---

[7]      These letters are not in the record, *see* (Def.'s SUMF re: Kletcheck ¶ 106), and given that the Plaintiffs cannot remember what the letters were about, they do not support an inference that Pepperidge Farm disciplined Plaintiffs for purposefully deviating from the planograms.  Furthermore, Carpenter testified that he did not receive a five-day letter during the class period.  (Def.'s SUF re: Carpenter ¶ 96.)

deviated from planograms many times over the years without discipline from Pepperidge Farm.  Walker testified that "at times" he deviated from the planogram after getting permission from the store manager.  (Def.'s SUMF re: Walker ¶¶ 106–07; Walker Dep. 59:15–61:4.)  For example, Walker said that shoppers at several of his stores strongly preferred Pepperidge Farm's Chessmen cookies to its other cookie varieties, so he stocked Chessmen at "five, six, sometimes nine" facings instead of the "one to three facings" called for in the planogram.  (Walker Dep. 59:15–61:4.)  Although Pepperidge Farm "at times, didn't agree with" Walker's decision because "[t]hey wanted [him] to have more variety, . . . . after a little pushback from [Walker], they kind of just let it go."  (*Id.*; Def.'s SUMF re: Walker ¶¶ 105, 109.)  This demonstrates that although Pepperidge Farm may try to convince IDPs to reconsider actions it disagrees with, it ultimately lacks the right to control their sales strategy.  Carpenter testified that he sometimes deviated from the planogram because of "product availability, or store demand."  (Carpenter Dep. 289:17–24.)  He also said he does not need Pepperidge Farm's permission to deviate from the planogram; instead, he clears it with the store's personnel.  (*Id.* at 202:25–203:25; Def.'s SUMF re: Carpenter ¶ 87; Carpenter's Resp. to Def.'s SUMF ¶ 87, ECF 91-3.)  Kletcheck also testified to deviating from the planogram "dozens of times" since March of 2020 and "maybe a few times" before that, without repercussions from Pepperidge Farm.  (Def.'s SUMF re: Kletcheck ¶ 104.)

Plaintiffs argue that Pepperidge Farm controlled the manner of their work by enforcing its "Hub and Depot Operating Policy," which sets rules to be followed by "[e]veryone who enters or transacts business" in Pepperidge Farm's warehouses.  (Hub and Depot Operating Policy, Ex. H, ECF 91-14.)  It includes rules for general workplace

conduct (e.g., prohibiting "[u]sing inappropriate or threatening language" and "[s]moking"), safety (e.g., requiring shirts and closed-toe shoes), use of Pepperidge Farm-owned equipment (e.g., "only certified Pepperidge Farm or Snyder's-Lance, Inc. employees are authorized to operate the power jacks), maintenance (e.g., "loading docks should be kept clear of debris"), and organization (e.g., "IDPs may only remove their inventory or inventory they are otherwise authorized to remove"). (*Id.*) But these rules apply only at the warehouses, apply to everyone on the premises, and ensure a safe and orderly environment for employees and guests alike. (*Id.*) They are not the type of control only appropriate in an employment relationship. *Cf. Washington v. ABM Janitorial Servs.*, 2013 WL 6047494, at *7 (E.D.Pa. Nov. 15, 2013) (in employment discrimination case, holding that "[m]erely extending the protection of an anti-harassment policy to non-employees should not be enough to convert every non-employee of a company into an employee").

Pepperidge Farm checks IDPs' performance using "route rides" and "store evaluations," but not frequently enough to constitute the kind of oversight normally involved in an employer-employee relationship. The plaintiffs testified that route rides—in which a Pepperidge Farm employee would shadow an IDP and suggest ways to increase sales—took place about once a quarter before the pandemic (but less frequently after 2020), and that IDPs can decline them.[8] (Def.'s SUMF re: Walker

---

[8]     Kletcheck submitted, under seal, a "Route Ride Report" Pepperidge Farm employee Andrew Pickul completed for "Warehouse Trainers, Inc." in June of 2018. (Route Ride Report, Ex. I, ECF 93-1.) Pickul's comments all go to work product—the presentation of Pepperidge Farm's product to consumers in stores and Kletcheck's "best efforts" to maximize sales opportunities and introduce new varieties. At the end of the evaluation, Pickul includes some action items related to improving communication with specific store personnel. Coaching like this on a regular basis could constitute employer-like control over the manner of work. But given the infrequency of route rides, these short-term recommendations do not control the day-to-day manner of Kletcheck's work.

¶¶ 95–96; Kletcheck Dep. 126:8–10; Carpenter Dep. 249:9–250:24.)  "Store evaluations"
are similar to route rides, but the Pepperidge Farm employee checks in on the stores
independently instead of following along with the IDP.  (Walker Dep. 120:1–24;
Carpenter Dep. 279:4–15, 284:4–15; Kletcheck Dep. 260:3–261:9.)  Pepperidge Farm's
monitoring is not sufficiently extensive or compulsory to control the IDPs' manner of
work.

*C E Credits*, 946 A.2d at 1169, is instructive in its discussion of the appropriate
extent of oversight in an independent contractor arrangement.  There, "monitors" hired
by an online continuing education company to review students' coursework brought
claims for unemployment compensation.  In holding that the monitors were
independent contractors, the Commonwealth Court recognized that "[e]very job,
whether performed by an employee or by an independent contractor, has parameters
and expectations."  *Id.*  It distinguished control over contractors' work product from
control of the time, place and manner of employees' work.  *Id.*  The continuing
education company's expectation of "good grammar, . . . occasional spelling checks of
[monitors'] responses [to students], and" expectation that responses "be consistent with
[its] rubrics" constituted control of work product, not the manner of the monitors' work.
*Id.*  Similarly here, Pepperidge Farm's planograms, store evaluations and route rides
constitute control over IDPs' work product—the service they provide to the retail
stores—consistent with an independent contractor relationship.  *Cf. Franze*, 2019 WL
2866168, at *3 ("while . . . Defendants did exercise some control over Plaintiffs'
enterprises, and sent them breach letters when Plaintiffs were not in compliance with

the terms of the agreement, Plaintiffs generally had a high degree of control over how to operate their businesses.").

D

Plaintiffs argue that Pepperidge Farm usurps their control over the varieties and quantities of products they order.  Pepperidge Farm runs a "pallet program," which allows retail chains, at the corporate level, to request delivery of a pallet of product to the chain's warehouse, and then ship the pallet through their own distribution channels to one of their retail stores.  (Def.'s SUMF re: Carpenter ¶¶ 5, 119; Pls.' CSOF ¶ 89.) The transactions take place at the inter-corporate level, and usually neither the IDP nor the store has advance notice of the delivery.  (Pls.' CSOF ¶ 87; Carpenter Dep. 235:4–12.)  When IDPs know a pallet is coming, they sometimes ask Pepperidge Farm to cancel the order, but the pallet often shows up anyway.  (Carpenter Dep. 235:4–12; Walker Dep. 174, 176.)  The pallets double as displays, and IDPs are asked to set them up when they arrive at the store.  (Kletcheck Dep 168:15–17.)  IDPs cannot bring in more of the product until the pallet inventory is used up, but they earn their usual commission, less a "pallet fee," for the sale of product from the pallet.  (Def.'s SUMF re: Carpenter ¶ 120; Def.'s SUMF re: Kletcheck ¶ 154; Def.'s SUMF re: Walker ¶ 166.)  The retail chains' decision to avail themselves of the program is not an exercise of control over IDPs' work that can be imputed to Pepperidge Farm, nor is Pepperidge Farm's failure to cancel its customers' orders at the IDPs' request.  *See Franze*, 2019 WL 2866168, at *7.

Pepperidge Farm also has a practice of "allocating" quantities of promotional product (e.g., products in holiday packaging or limited-edition flavors) to IDPs a few

17

times per year.  (Kramer Dep. 159–61, ECF 91-10.)  IDPs can opt out of the shipment or request a lower quantity.  (Def.'s SUMF re: Walker ¶ 110; Pls.' CSOF ¶ 37, ECF 91-2.)[9] Walker testified, however, that "on occasion" he still received allocations he opted out of.  (Pls.' CSOF ¶ 39.)  These occasional shipments, assuming they are not administrative errors, are not so extensive as to create an employer-employee relationship.  Moreover, Walker testified that he was free to sell the unwanted product to other distributors or leave it in the warehouse to "stale out" rather than deliver it to his stores.  (Walker Dep. 105:17–107:9; Def.'s SUMF re: Walker ¶ 111.)

### E

Carpenter and Walker testified that they view their distribution routes as independent businesses.  *See* (Carpenter Dep. 243:5–9 (viewed Pepperidge Farm as business partner, not boss); Walker Dep. 191:7–11 ("I'm in the business to sell product, and I want people to buy my product.  And I feel Pepperidge Farm, the brand, does that.  That's why I bought another route.").  IDPs' freedom to shape the scope and structure of their operations is consistent with this understanding—employees cannot pick where they work.  IDPs buy territories they believe to be "good investments," (Walker Dep. 25:19–20), and sell them whenever they believe it makes business sense to do so.  (Def.'s SUMF re: Kletcheck ¶ 53.)  The IDPs can list their routes for whatever price they think appropriate and are free to locate and identify buyers however they want.  (Def.'s SUMF re: Walker ¶¶ 24, 48 (Walker testifying that "as a business owner,

---

[9]    Pepperidge Farm's objection to this paragraph is a linguistic quibble, not a genuine dispute.  (Def.'s Resp. to Pls.' CSOF ¶ 37, ECF 96.)  Plaintiffs state that they "must opt-out of limited-time-offers for PF products and promotions," whereas Pepperidge Farm insists that the correct characterization of the testimony is that "Plaintiffs have an *option* to adjust their allocations."  (*Id.*)  Regardless of their preferred phrasing, the parties agree that IDPs can instruct Pepperidge Farm not to send them the amount allocated.

you can use multiple avenues"); Def.'s SUMF re: Carpenter ¶ 48; Def.'s SUMF re:

Kletcheck ¶ 30.[10])  The buyer and seller negotiate and consummate the sale directly,

without Pepperidge Farm.  (Def.'s SUMF re: Walker ¶¶ 16–17, 60; Def.'s SUMF re:

Kletcheck ¶ 17;[11] Def.'s SUMF re: Carpenter ¶ 17.)   IDPs are free to sell off portions of

their routes, and buyers can combine routes or portions of routes into new territories so

long as the new route will generate sufficient revenue to support the IDP's financial

obligations.  (Def.'s SUMF re: Walker ¶¶ 37–38, 65–71; Def.'s SUMF re: Kletcheck ¶ 21;

Carpenter Dep. 96:3–12, 240:25–241:7.)  The choice of how to finance the purchase is

left to the buyer.  (Def.'s SUMF re: Kletcheck ¶¶ 25,[12] 38–41; Def.'s SUMF re:

---

[10]     Plaintiffs object to this paragraph, arguing that Kletcheck testified that he discussed with
Pepperidge Farm what the route could sell for and what Pepperidge Farm would approve.
(Kletcheck Resp. to Def.'s SUF ¶ 30, ECF 91-4.)  Kletcheck's testimony was:

> Q.   Did Pepperidge Farm tell you what purchase price you had to set for the purchase
>       price?
> A.   Not—not an exact price, but the—there was discussions with Joe DiNatale telling
>       me basically what I could sell it for or what they would approve—the amount they
>       would approve him for.
> Q.   Sure.  They might—so Mr. DiNatale may have told you that how big of a loan the
>       buyer could get, but my question is, did Mr. DiNatale tell you what price you had
>       to sell your route for?
> A.   No.

(Kletcheck Dep. 118:3–16.)  There is no genuine dispute that Pepperidge Farm did not set the sale
price for routes.

[11]     Plaintiffs note that Kletcheck also testified that Pepperidge Farm employee "Joel Troutman
told Plaintiff Kletcheck the route price."  (Kletcheck Resp. to Def.'s SUF ¶ 17.)  This fact does not
support an inference that Pepperidge Farm was involved in negotiating the route price.

[12]     Kletcheck objects to this paragraph, arguing that his testimony was more equivocal.
(Kletcheck's Resp. to Def.'s SUF ¶ 25.)  He testified:

> Q:   . . . .  You could have taken a loan from any bank that you wanted, correct?
> A:   I guess.
> Q:   You took the Bank of America loan because you determined that was the best
>       decision for your business, correct?
>                                * * *
> A:   That was the—that's what I was—I was told to finance through them.
> Q:   But you weren't required to finance through them, correct?
>                                * * *
> A:   I guess not.

Carpenter ¶¶ 32–34; Def.'s SUMF re: Walker ¶¶ 39–40.)  Pepperidge Farm's only control over the sale, reserved in the Consignment Agreement, is a right of first refusal and the right to disapprove the sale if the buyer is unqualified to run the route. (Carpenter Consignment Agreement ¶ 18) ("Bakery will grant such approval . . . if . . . (iii) the purchaser meets the requirements of Bakery as to character, ability, financial responsibility, business acumen, adequate facilities and involvement in the business"). These minor limitations are consistent with the rights of anyone who engages an independent contractor to make sure the contractor is qualified to perform the job and solvent enough to see the work through, and they do not unreasonably limit the IDPs' chances of identifying an appropriate buyer.

F

On this record, Pepperidge Farm did not have the right to control the time, place and manner of IDPs' work.  The Second Circuit reached the same conclusion in *Franze v. Bimbo Bakeries USA, Inc.*, 826 F. App'x 74, 77 (2d Cir. 2020). [13]  The facts of that case were nearly identical to those here, with some facts in this case even more favorable to finding that the IDPs are independent contractors.  *See* Pls.' Counterstatement of Disputed Material Facts in Opp. to Defs.' Mot. for Summ. J., *Franze v. Bimbo Foods Bakeries Distribution, LLC*, Case No. 7:17-cv-03556-NSR-JCM, ECF 90 (S.D.N.Y. Nov.

---

(Kletcheck Dep. 100:25–101:17.)  There is no genuine dispute that Kletcheck's testimony shows that Pepperidge Farm did not have the right to control how he financed the route.  Encouraging a worker to pursue a certain course of action—even being pushy about it—does not matter if, at the end of the day, Pepperidge Farm did not have the right to require the worker to act in a certain way.  Nor does the fact that Kletcheck did not explore alternatives to the suggested course of action affect Pepperidge Farm's ultimate right to control him.

[13]    FLSA cases are persuasive authority in the WPCL context.  *Estate of Accurso v. Infra-Red Servs., Inc.*, 805 Fed. App'x 95, 101 n.3 (3d Cir. 2020) (unpublished).

13, 2018).  For example, Bimbo's distributors "had no control over product quantities or prices with [chain] customers," *Franze*, 2019 WL 2866168, at *3, and Pepperidge Farm's ability to withhold approval of a route sale is at least as narrow, if not more closely circumscribed, than Bimbo's.  *See* Franze Agreements § 6.1, Case No. 7:17-cv-03556-NSR-JCM, ECF 92-25 ("any such sale or transfer shall be subject to: (a) the prior written approval of BFBD, which approval will not be unreasonably withheld; and (b) a right of first refusal on the part of BFBD . . . .").  Just as in this case, the bakery in *Franze* "did not control [distributors] directly and closely enough to render their relationship an employer-employee relationship" because the distributors controlled the scope of their distribution territories, could hire others to perform their work for them, controlled their own schedules, and were not subject to the bakery's "day-to-day oversight." *Franze*, 826 F. App'x at 77.

At oral argument, Plaintiffs relied on Judge Greenberg's concurrence in *Accurso* and the Third Circuit's decision in *Razak v. Uber Technologies, Inc.*, 951 F.3d 137 (3d Cir. 2020).  *Accurso* was a very different case.  There, the employer "admitted at his deposition that he had the right to control Accurso's work."  *Estate of Accurso*, 805 F. App'x at 101.  The record "contain[ed] multiple memoranda from [the employer] to Accurso that not only assigned tasks to Accurso but communicated the way in which the tasks were to be completed" and "instructed Accurso to complete administrative tasks, which were not clearly related to the marketing work for which Accurso was contracted, and required him to keep [the employer] informed of his activities."  *Id.* at 102.  The employer "circumscribed Accurso's work hours and directed Accurso's movements."  *Id.*  One of the reasons the employer cited for terminating Accurso was

his failure to give notice before going on vacation.  *Id.*  In contrast, the record here shows that the IDPs set their own hours and schedules, and there is no evidence that they apprise Pepperidge Farm of their day-to-day activities or are asked to undertake tasks unrelated to product distribution.

In *Razak*, an FLSA case, the Third Circuit held that summary judgment was inappropriate because there were genuine disputes of fact as to whether UberBLACK drivers could drive for other services and Uber's control over hours worked.  *Id.* at 146.  There was even a dispute as to whether a driver's acceptance of a trip request constituted a contract with Uber or with the rider.  *Id.* at 145.  Uber also controlled "a driver's territory, which is subject to change without notice."  *Id.* at 147.  That case involved highly technical disputes regarding whether aspects of the platform Uber developed constituted Uber's control over its workers, which are not analogous to Pepperidge Farm's control of product distributors.

V

The remaining factors also favor classifying the IDPs as independent contractors.  The IDPs are responsible for results of their work only:  They do not report regularly to Pepperidge Farm, and they direct their own schedules and movement.  *See* Part IV.A, *supra*; *Estate of Accurso*, 805 F. App'x at 102.

The Consignment Agreement provides that "Consignee is a self-employed independent contractor. . . .  The independent contractor relationship between Bakery and Consignee is an essential element of this Agreement.  The discount percentage and commission rate . . . are based in substantial part on such independent contractor

22

relationship . . . ." (Carpenter Consignment Agreement ¶ 15.)[14]  Although contractual

language cannot transform an employee into an independent contractor, *Estate of*

*Accurso*, 805 F. App'x at 103, it weighs in favor of independent contractor classification

where, as here, it is consistent with other aspects of the parties' relationship.  *See C E*

*Credits*, 946 A.2d at 1170.

The nature of the IDPs' work also signals an independent contractor

relationship.  In *Estate of Accurso*, the plaintiff "was responsible for the majority of

Defendants' administrative work."  805 F. App'x at 102.  Since "the nature of Accurso's

work involved menial tasks for Defendants' business," the court found it indicative of an

employee relationship.  IDPs, by contrast, are responsible for ensuring that stores in

their territories are stocked with fresh products, which they order based on consumer

habits and other external factors.  (Def.'s SUMF re: Kletcheck ¶ 119; Def.'s SUMF re:

Walker ¶ 113; Carpenter Dep. 212–14.)  At this level, their work involves the exercise of

judgment and sales strategy; it is far from task-based.  Although assembling pallet

program displays could arguably constitute a menial task, IDPs are only occasionally

asked to do this.  The bulk of their work involves more than menial tasks for

Pepperidge Farm's business.

Pepperidge Farm's corporate designee testified that the company does not

require IDPs to have any specific training or experience to purchase a route.  (Pls.'

CSOF ¶ 104.)  And "[i]t is generally accepted that 'driving' is not itself a 'special skill.'"

*Razak v. Uber Techs., Inc.*, 951 F.3d 137, 147 (3d Cir. 2020) (interpreting FLSA).  But

---

[14]     Walker's 2010 Consignment Agreement uses the term "independent businessman" instead of
"independent contractor."  (Walker Consignment Agreement ¶ 15.)  This difference does not change
the provision's significance for purposes of this analysis.

Plaintiffs testified that they leverage their communication skills, understanding of consumer habits, and efforts in servicing their stores to make their routes more profitable.  (Def.'s SUMF re: Carpenter ¶¶ 98–100; Def.'s SUMF re: Kletcheck ¶ 129; Def.'s SUMF re: Walker ¶¶ 114–16.)  All three also testified that their prior industry experience gives them an edge in maximizing the profitability of their routes.  (Def.'s SUMF re: Carpenter ¶ 97; Def.'s SUMF re: Walker ¶ 42; Kletcheck Dep. 81:7–16.)  The skill factor therefore favors independent contractor status. *Cf. Franze*, 826 F. App'x at 78 (FLSA skill factor favored finding of independent contractor because "operating [distributors'] businesses required more than the ability to drive; their success depended on their ability to increase sales, build customer relationships, effectively identify the popularity of different products, hire and train employees, and manage profits and losses").

The IDPs own and provide the essential tools for carrying on distribution businesses, which weighs heavily in favor of independent contractor classification. IDPs own their trucks and hand trucks.  (Def.'s SUMF re: Kletcheck ¶¶ 131, 138; Def.'s SUMF re: Carpenter ¶ 65; Def.'s SUMF re: Walker ¶ 123.)  They decide what kind of vehicle to use and when to replace it.  (Def.'s SUMF re: Carpenter ¶ 62; Def.'s SUMF re: Kletcheck ¶¶ 132–33.)  IDPs also select and pay for their own auto insurance, maintain the vehicle registration, and pay for their own gas.  (Def.'s SUMF re: Carpenter ¶ 69; Def.'s SUMF re: Walker ¶¶ 125–27; Def.'s SUMF re: Kletcheck ¶¶ 133, 143.)  They are not required to place a Pepperidge Farm logo on their trucks or paint them a certain color, nor wear Pepperidge Farm clothing—or any type of uniform—while working. (Def.'s SUMF re: Walker ¶ 127; Def.'s SUMF re: Carpenter ¶¶63–64, 66; Kletcheck Dep.

201:22–202:13.)  IDPs also own their "handhelds"—portable inventory management devices.  (Def.'s SUMF re: Walker ¶¶ 128–29; Def.'s SUMF re: Kletcheck ¶ 140; Def.'s SUMF re: Carpenter ¶ 68.)  Plaintiffs complain about Pepperidge Farm's requirement that they use a specific make and model of handheld and that Pepperidge Farm deducts a mandatory monthly fee to cover an extended warranty-type program.  But requiring IDPs to use a device that is compatible with Pepperidge Farm's software systems is just as consistent with an independent contractor relationship as with an employment relationship.  For example, contract attorneys hired by a law firm to review documents are not transformed into employees because the firm requires them to use a specific eDiscovery platform.  Similarly, Pepperidge Farm's handheld specifications, in context, do not diminish the weight this factor adds to the independent contractor side of the scale.

The IDPs are paid on commission, which is consistent with an independent contractor arrangement.  *See Estate of Accurso*, 805 F. App'x at 101; *Guzzi v. Morano*, 2013 WL 4042511, at *15 (E.D. Pa. Aug. 8, 2013).

Plaintiffs' businesses are not inextricably intertwined with Pepperidge Farm's, but neither are they totally distinct.  They can use the equipment they own to perform the same service for a different manufacturer without overhauling their business.  Indeed, the Consignment Agreements recognize this possibility and expressly permit IDPs to distribute other manufacturers' noncompeting products along their routes.  (Carpenter Consignment Agreement ¶ 4); *see SkyHawke*, 27 A.3d at 1058.  On the other hand, there is a significant degree of cooperation and crossover between Pepperidge

Farm's and the IDPs' efforts to market products and obtain chain store space.  The "distinct business or occupation" factor is a wash.

Pepperidge Farm argues that the IDPs' distribution business is not part of its regular business of "wholesale manufacturing".  But the record evidence shows, at the very least, that Pepperidge Farm conducts some of its distribution activity independent of the IDPs through its pallet program.  (Def.'s Resp. to Pls.' Consolidated Counterstatement of Facts ¶ 89, ECF 96.)  This lone factor favors an employment relationship.  *See Franze*, 826 F. App'x at 78 (reasoning that distribution services were integral part of bakery's stated business model of "product manufacturing and sales to end-market consumers" because "we do not see how a model involving 'sales to end-market consumers' could function without distributors that carry a company's product to those consumers" (emphasis omitted)).

Finally, Pepperidge Farm has a limited right to end its relationship with the IDPs.  Under the Consignment Agreement, it can either terminate the IDP for one of eleven narrow, specifically enumerated causes, or it can buy the distributorship at 125% of fair market value.  (Carpenter Consignment Agreement ¶¶ 19, 20.)  Traditionally, the hallmark of an employment relationship has been the employer's right to terminate the relationship at any time with or without cause.  *See, e.g.*, *Feller v. New Amsterdam Cas. Co.*, 70 A.2d 299, 301 (Pa. 1950).  The Consignment Agreement significantly circumscribes Pepperidge Farm's ability to terminate IDPs' contracts.  Pepperidge Farm can only terminate the relationship for eleven specific reasons and the buyback term protects the IDPs' "investment" in their routes.  *See* (*id.* at ¶ 19; Def.'s SUMF re: Walker ¶ 57).  Unlike employee severance, which is normally based on

the employee's rate of compensation, the buyback provision is based on the fair market value of the routes.  It represents a buyout of the businesses that the IDPs grew through their efforts and exercise of business judgment.  *See* (Def.'s SUMF re: Walker ¶¶ 114–15; Def.'s SUMF re: Carpenter ¶ 97).  Pepperidge Farm's limited ability to terminate a distributorship is inconsistent with an employer's broad right to dismiss an employee, and weighs in favor of an independent contractor arrangement.

VI

As Pepperidge Farm acknowledges in its brief, summary judgment in its favor on the WPCL claim moots its unjust enrichment counterclaim.  (Pepperidge Farm's Br. in Opp. to Countercl. Defs.' & Third-Party Defs.' Mot. for Summ. J. at 1 n.1, ECF 89.) Plaintiffs' Motion for Summary Judgment on the unjust enrichment counterclaim is denied as moot, (ECF 77), as is their Motion to Exclude the Testimony of Pepperidge Farm's expert witness Finnie B. Cook, Ph.D. (ECF 79.)

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.